EXCLUSIVE                    PAGE 3 OF 6 | 1 2 3 4 5 6

# The Man Who Conned Oprah

**continued**

It also leads to tense scenes in Hazelden, when Frey, sitting with his parents, realizes that "The Day of Judgment has arrived." A lawyer for the facility, who had been talking on Frey's behalf with the Ohio authorities, gravely informs him that, "You're in a lot of trouble in Ohio. It's a Small Town and they don't see much like what they saw with you. They say you caused quite a few problems there and made a number of enemies within the Police Department." The attorney, named Randall, adds, "They are incredibly angry, as angry as any Prosecutors that I have ever had to deal with on a case, and they want to make an example out of you."

Randall then relays a prosecution offer: "If you agree to plead guilty to all of the charges, they'll agree to three years in State Prison, followed by five years of Probation. If you violate your Probation, you will be required to serve the full term of the Sentence, which is an additional five years." Randall added that Frey would also have to pay $15,000 in fines and serve 1000 hours of community service upon his prison release.



Frey's parents, Robert and Lynne, in the audience at "Oprah"

But if he opted for a trial, prosecutors would press for the "maximum Sentence, which is eight and a half years," Randall warned. And that didn't seem like such a good idea since, Randall explained, prosecutors claimed to have 30 witnesses, a blood alcohol test registering .29, and a bag of crack as evidence.

"The fear is gone, replaced by horror," Frey writes. "I shake my head, think about three years in a State Prison...Three years of savagery, three years of fighting and three years protecting myself every second of every day. Three fucking years."

With his mother in tears, Frey's father asks, "Would you like to mount a defense?"

"It'd be a waste of time."

"Why?"

"Because I'm guilty of all the charges."

Resigned to his fate, Frey announces that he'll take the plea deal, though the three years in prison "is an eternity, and it's likely I'll be put in

Maximum Security. I have never been there, but I know people who have been there. They did not come out rehabilitated and they did not come out resembling who they were when they went in. Addicts became Thieves. Thieves became Dealers. Dealers became Killers. Killers killed again."

Frey then requested that Randall try to keep him off a "Maximum Security Block." In fact, Frey added, "If there's any sort of choice, which sounds like an incredible longshot, I would rather do more time than go into Max."

It would take 83 more pages of "A Million Little Pieces" to finally learn the disposition of Frey's Ohio case.

He is called into a room at Hazelden where Randall passes on some good--and unexpected--news. The Ohio prosecutor had magically "encountered some problems, that there were some issues with missing evidence, and that he had received a couple of phone calls on your behalf," the lawyer reported. While Frey had, only weeks earlier, agreed to three years in prison (with the specter of eight-plus if convicted at trial), Randall explained that the prosecutor, who goes unnamed, had suddenly turned course. He was now willing, in return for Frey doing three-to-six months in a county jail, to reduce felony counts to misdemeanors and wipe Frey's record if he satisfactorily completed a three-year probation term.

Frey, not surprisingly, was ecstatic, since "three to six months in County is a fucking cakewalk...I'll be in with a bunch of drunk drivers and wife beaters and Pot dealers. I won't have any problems with them. It'll be a cakewalk."

A few pages later, Frey attributes the sudden reversal of fortune (or fix) to the intercession on his behalf by two fellow rehab center residents, the gangster Leonard and Miles, a New Orleans federal appeals court judge. "Thank you both very much," he says after approaching the pair in a Hazelden room. "Consider yourself a very fortunate young man, James," says Miles. "Very fucking fortunate," Leonard adds.

Now, suddenly free from the prospect of three long years in the can, Frey can chart his post-rehab life with Lilly, the Hazelden squeeze he plans on reuniting with in Chicago after his three months in jail. Leaving Hazelden, he tells a crying Lilly, "I have to go to jail in Ohio. It's only a few months. I'm going to write you every day, and I'll call you whenever I can."

As it turned out, however, things didn't go as planned for James and Lilly, according to the opening pages of "My Friend Leonard." With just a day left in jail, Frey speaks by phone with a hysterical Lilly, who is distraught over her grandmother's recent death. "Scared and lonely" and "sobbing and heaving," she begs Frey, "I need you right now, please, please, please, I need you right now." Frey explains, "I'm in jail Lilly, I can't do anything here but talk to you." He tries to console her by promising he'll be out in just 12 hours and would race to her side.

Case 1:06-cv-01167-RJH Document 40-4 Filed 01/04/2007 Page 3 of 5

Upon leaving the Ohio jail, Frey sped, 20 red roses in hand, to a Chicago halfway house for a reunion with his crackhead inamorata. Sadly, imprisonment had slowed a timely rescue mission and Frey arrived too late: Lilly had hung herself from the shower faucet, just another one of James Frey's People Who Died. A reader, of course, can only ponder whether fragile Lilly would have perished if James didn't have to do those three months in an Ohio lockup.

• • •

When TSG read Frey's description of his arrest, the related criminal charges, and the case's strange disposition, we first attempted to find court records related to the incident. We assumed--correctly as it turned out--it might have occurred in Licking County, Ohio, which includes the village of Granville (present pop. 5098, including students) and the Denison campus.


Licking County Sheriff Randy Thorp

However, indices at the county's Common Pleas Court--where felony cases are handled--contained no records for Frey. At the county's Municipal Court, where misdemeanor and traffic cases are adjudicated, only a single matter turned up, a November 1990 traffic ticket for speeding and driving without a seat belt. Frey paid a small fine and the case was closed out. When we reviewed Mayor's Court dockets in Granville, there was also no record for Frey.

Of course, it was only later that we learned from Frey that the records--once apparently held in Municipal Court--had been expunged as part of his wall building effort. An Ohio defendant is eligible for the expungement, or sealing, of court records if, among several conditions, the case at hand was their first conviction (or if prior convictions involved only minor misdemeanors). An expungement petition, which can only be granted by a judge, can first be made after a year has passed following a defendant's "final discharge." A final discharge refers to a defendant's completion of a jail or probationary term.

A search by Licking County Sheriff Randy Thorp at the county jail also turned up nothing. Frey, he told TSG, had never been an inmate in the jail, a small, low-rise facility off Route 16 in Newark, Ohio.

When we ran Frey's name past Robert Becker, Licking County's Prosecuting Attorney, he could find no record that his office, which deals with felony prosecutions, had ever handled a case against the author. Becker, the county's chief prosecutor since 1984, told TSG that he had reviewed both his office's computer system and an index card catalog that predates the computerized records. He noted that his office would generally maintain a record "on any case that came in whether or not it resulted in felony charges."

Becker raised the possibility that Frey's case may not have risen to the level of either being handled (or reviewed) by his office if the charges were not as severe as Frey claimed. In such an instance, a city or village would sometimes farm the prosecution out to an attorney in private practice who is retained to handle minor misdemeanor cases. Becker, who read Frey's account of the Ohio case after we provided him with pages from "A Million Little Pieces," noted that the author claimed to have been charged with felony DUI, a count that did not exist in Ohio until after 1996. He was also stumped by another count: "There is no such charge as felony mayhem." And as for the threat of such hefty fines and community service terms? "I can't think of any cases where we ever got any kinds of substantial fines in this county, let alone $15,000, my gosh. One thousand hours of community service? Oh, come on."

And when we asked about Frey's case being fixed from afar by two Hazelden cronies, one of whom was a mobster, Becker laughed. "Oh, my gosh, wasn't me," he said. "It wasn't me." He then added, "It does not seem likely to me that any of these events occurred in this county."

Which, as we soon learned, was an accurate appraisal from the veteran lawman.

When we first contacted the Granville Police Department, an initial search also came up empty. But then Sergeant Dave Dudgeon, 45, dug into old mug shot binders and found a photo of Frey snapped in the wee hours of October 25, 1992. That discovery led him to the department's basement, where old police incident reports are stored. While many agencies would have destroyed documents dating back 13 years, Chief Steve Cartnal, 47, explained that the Granville P.D.--which makes between 300-400 arrests annually and employs nine full-time officers--was not pressed for storage space, so there was no need to toss records.



Granville Police Department
Sergeant Dave Dudgeon

In the basement, Dudgeon located Granville Police Department Official Report 92-300B, which memorialized Frey's now-famous Ohio arrest. As he looked at the report's face page, Dudgeon recognized the name of the arresting officer: "Oh, it was me!"

The Granville report, which you can read here, gave this description of Frey's arrest:

While on foot patrol at about 11 PM on October 24, Dudgeon was standing in front of a knick-knack store called the Tole House when he spotted a 1989 white Mercury pull out of a nearby bank parking lot. The driver then attempted to park in a no parking zone directly across the street from the Granville firehouse and a few doors down from a

bar/pizzeria popular with Denison students. The vehicle's right front tire rolled up onto the curb, missing a power pole by just a few inches.

[Click here to see a photo of the Ohio crime scene, complete with arrows showing the path of Frey's Mercury. TSG snapped the image last month in Granville.]



Dudgeon, then 32 and on the Granville force for 3-1/2 years, approached the car and told Frey that he was in a no parking zone. Dudgeon noticed that Frey was slurring his words, his eyes were bloodshot and glassy, and he smelled of alcohol. There was also a half-full, 12-ounce bottle of Pabst Blue Ribbon beer between the car's bucket seats. After Frey exited the Mercury at Dudgeon's request, the cop administered several field sobriety tests, which Frey failed. Dudgeon then arrested the 23-year-old. Since Dudgeon was on foot, a second cop came and drove Frey the few blocks to police headquarters. There, Patrolman Charles Maneely reported, Frey declined to take a blood alcohol test.

Since headquarters did not have a cell or any kind of secured holding area, Cartnal explained, Frey would have been placed in a paneled room with chairs and a fold-up table upon which sat the department's Breathalyzer machine. And Frey would not have been handcuffed unless he was being unruly, added Cartnal.