## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

IN RE "A MILLION LITTLE PIECES"
LITIGATION

No. 06-md-1771

Hon. Richard J. Holwell

---

## DEFENDANTS' RESPONSE TO THE OPPOSITION OF
## PLAINTIFF SARA RUBENSTEIN TO ADDRESS FIRST AMENDMENT ISSUES

Defendants Random House, Inc., Doubleday & Company, Inc., Random House

V.G., Inc., James Frey, Maya Frey, and Big Jim Industries, Inc. (collectively "Defendants")

hereby submit the following response to the opposition brief filed by Plaintiff Sara Rubenstein

("Opposition").

## INTRODUCTION

After months of arms-length negotiations, Defendants entered into a fair and

reasonable settlement with a large group of plaintiffs' counsel (the "AMLP Group"). The AMLP

Group moved for preliminary approval of the settlement on January 4, 2007. On January 19,

2007, Plaintiff Sara Rubenstein ("Rubenstein") filed her Opposition. Rubenstein argues, among

other things,[1] that as part of the notice program set forth in the settlement agreement submitted to

the Court for approval, this Court should require the parties to "request or subpoena" the

identities of book purchasers from on-line booksellers so that such persons can receive class

notice via e-mail. (Opposition at 4-5.)

The AMLP Group has filed a brief explaining why such efforts are not required

under applicable law. In addition, Defendants demonstrate in this response that the Rubenstein

Opposition's proposed "request or subpoena" would violate the First Amendment to the United

---

[1] Rubenstein raised additional issues in her Opposition that are addressed in the AMLP Group's reply.

States Constitution. Rubenstein ignores the fact that the purchase of books is an activity

protected by the First Amendment, and instead treats this case like a run-of-the-mill securities

case. By far, these constitutional considerations outweigh the marginal, if any, benefit to the

members of the settlement class from Rubenstein's proposal and should be the death-knell of

Rubenstein's notice argument.

**ARGUMENT**

**I.      Requiring Third Parties To Provide Class Lists Of Readers Would Be
         Unconstitutional.**

**A.      Purchasing Books is A Protected First Amendment Activity.**

It is a mistake to treat this case like a securities case. Unlike ascertaining whether

someone purchased fifty shares of ABC Corporation, determining who purchased a particular

book infringes on readers' rights of expression long protected by the First Amendment. As a

result, Rubenstein treads on sacred constitutional ground when she asks this Court to compel the

parties to subpoena records from on-line booksellers identifying the persons who purchased *A

Million Little Pieces* ("the Book") on-line.

It is well-settled that the First Amendment protects a person's right to receive

ideas and engage in expressive activity. *Board of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (the

First Amendment right to receive ideas "follows ineluctably from the sender's … right to send

them" and is also "a necessary predicate to the recipient's meaningful exercise of his own rights

of speech, press, and political freedom"); *see also Kleindienst v. Mandel*, 408 U.S. 753, 762

(1972) ("In a variety of contexts this Court has referred to a First Amendment 'right to receive

information and ideas.'"); *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) ("The right of

freedom of speech and press includes not only the right to utter or to print, but the right to

distribute, the right to receive, the right to read….").

2

Closely intertwined with these protected freedoms is a person's right to engage in such activity anonymously. In language seemingly tailored to the First Amendment issues now before this Court, Justice Douglas explained that anonymity is a critical safeguard against the inevitable chilling effect of potential disclosure:

> A requirement that a publisher disclose the identity of those who buy his books, pamphlets, or papers is indeed the beginning of surveillance of the press. ... Once the government can demand of a publisher the names of the purchasers of his publications, the free press as we know it disappears. Then the specter of a government agent will look over the shoulder of everyone who reads. ... If the lady from Toledo can be required to disclose what she read yesterday and what she will read tomorrow, fear will take the place of freedom in the libraries, bookstores, and homes of the land. Through the harassment of hearings, investigations, reports, and subpoenas government will hold a club over speech and over press.

*United States v. Rumely*, 345 U.S. 41, 57-58 (1953) (Douglas, J., concurring).[2] More recently, and likewise employing a constitutional analysis directly relevant to the instant matter, the Colorado Supreme Court similarly recognized that the act of purchasing a book is protected First Amendment activity:

> Bookstores are places where a citizen can explore ideas, receive information, and discover myriad perspectives on every topic imaginable. When a person buys a book at a bookstore, he engages in activity protected by the First Amendment because he is exercising his right to read and receive ideas and information. Any governmental action that interferes with the willingness of customers to purchase books, or booksellers to sell books, thus implicates First Amendment concerns.

*Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1052 (Colo. 2002).

---

[2] *See also Denver Area Educ. Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 754 (1996) (requiring viewers to affirmatively request certain cable programming "will further restrict viewing by subscribers who fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish to watch the 'patently offensive' channel"); *Lamont v. Postmaster General*, 381 U.S. 301, 307 (1965) (requirement that addressees file written requests with the post office to receive communist information deemed unconstitutional; such a requirement "is almost certain to have a deterrent effect"), *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 65 n.6 (1963) ("The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication.").

Rubenstein gives no consideration to these important First Amendment issues in her Opposition. However, there can be no dispute that the members of the class were exercising their First Amendment rights when they purchased the Book through on-line bookstores. Rubenstein's demand that the parties be required to subpoena the identities of those book purchasers is directly contrary to these critical First Amendment freedoms.

**B.    Courts Require a Showing of Compelling Interest Before Approving Intrusions Into First Amendment Rights.**

To prevail on her notice argument, Rubenstein must make a substantial showing that an intrusion into First Amendment freedoms is warranted. Indeed, before condoning any government interference with actions that involve First Amendment rights, courts require a demonstration that there is a compelling interest in the information at issue and that a significant nexus exists between the information sought and the need that will be fulfilled. *See, e.g., id.,* at 1056-57; *In re Grand Jury Subpoena to Kramerbooks & Afterwords, Inc.,* 26 Med. L. Rptr. 1599, 1601 (D.D.C. 1998) (attached hereto as Exhibit A); *see also Zurcher v. Stanford Daily,* 436 U.S. 547, 564 (1978) (search warrants that implicate expressive rights must comply with Fourth Amendment requirement with "scrupulous exactitude").

In light of this rigorous standard, courts have rejected requests similar to that made by Rubenstein here. In fact, although the Defendants are not aware of any case where a civil litigant has sought to compel the production of customer information from a bookseller, two courts have considered the analogous issue of whether government actors may compel bookstores to disclose customer information, and in both cases, have found that the requisite showing had not been made. *Tattered Cover,* 44 P.3d 1044; *Kramerbooks,* 26 Med. L. Rptr. 1599. In both cases, the courts found that the infringement to the stores' and customers' constitutional rights far outweighed the government's need for the information.

4

In *Tattered Cover*, the court considered whether a police department could execute a search warrant to obtain a bookstore's customer purchase records as part of an ongoing drug investigation. 44 P.3d at 1048. The court discussed the "substantial chilling effect" that allowing the search would have on the "individual's fundamental right to purchase books anonymously, free from governmental influence," specifically noting that numerous bookstore customers indicated that if the records were disclosed, they "would not feel at ease perusing, buying or reading a wide variety of books." *Id.* at 1047, 1061-63. The court further noted that:

> The need to protect anonymity in the context of the First
> Amendment has particular applicability to book-buying activity.
> As was explained in *United States v. Rumely*, governmental
> inquiry and intrusion into the reading choices of bookstore
> customers will almost certainly chill their constitutionally
> protected rights . . .

*Id.* at 1053. The court then balanced the interests of disclosure by considering the justification of the police for seeking the information, and whether the police had other reasonable means of conducting their investigation. *Id.* at 1061-62. As a result of this analysis, the court ruled that there was no compelling reason to justify the harm to the store's and readers' rights. *Id.* at 1063.

In *In re Kramerbooks*, a federal court considered whether Independent Counsel Kenneth Starr should be permitted to issue subpoenas to two bookstores in order to collect information on book purchases made by Monica Lewinsky. 26 Media L. Rep. at 1600-01. While the issue was eventually mooted when Lewinsky turned over the purchase information voluntarily, the court made clear that approval of this type of subpoena would have a substantial chilling effect on both the bookstores' and individual's rights. *Id.* at 1600. The court also indicated that requiring stores to disclose such information would have a severe impact on the bookstore's business – describing how numerous customers of one bookstore indicated they

5

would no longer shop there if the store turned over the personal information, profits at the store had begun to decline, and librarians had picketed the store in protest. *Id*. at 1600.

In addition to the judicial decisions discussed above, numerous federal and state statutes have also been enacted to prevent infringements on constitutionally protected rights to participate in expressive activities. *See, e.g.,* 18 U.S.C. § 2710 (prohibiting "unauthorized disclosure" of personal information related to video tape rentals and sales); N.Y. CPLR § 4509 (1988) (requiring libraries to keep all records containing "names or other personally identifying details regarding the users" confidential); Colo. Rev. Stat. § 24-90-119 (1998) ("a publicly-supported library or library system shall not disclose any record or other information which identifies a person as having requested or obtained specific materials or service or has otherwise used the library").

In contrast to these authorities, Rubenstein fails to cite a single example in which a court required the parties or a bookseller to disclose the identities of book purchasers based on a finding that there was a compelling interest for that disclosure that justified the infringement on purchasers' First Amendment rights. In her zeal to gloss over the important rights of the on-line Book purchasers implicated by her notice proposal, Rubenstein instead presumes without support that readers would prefer to abandon their First Amendment protections because they bought the Book on-line sometime prior to January 26, 2006, most likely for around $15. Putting aside the fact this scenario does not invoke a compelling interest under any plausible constitutional analysis, this is a highly personal decision which neither Rubenstein nor her counsel have any basis to contend they are suited to make for other readers.

C.    **Rubenstein Offers No Compelling Interests to Justify Violating the First Amendment.**

Rubenstein cannot establish a compelling interest for the infringement of the class members' First Amendment rights. Although *Tattered Cover* and *Kramerbooks* involved a governmental actor, the standard for a civil litigant to obtain access to such protected information through court-ordered subpoenas would almost certainly be even more exacting, and require an even more compelling interest. But even applying the same standard applied in *Tattered Cover* and *Kramerbooks*, the requisite balancing of interests here weighs heavily in favor of protecting readers' identities from disclosure and against Rubenstein's demand to use subpoenas to collect those identities.

As a threshold and dispositive matter, Rubenstein cannot establish that there is a compelling reason for disclosing information that has been afforded the highest level of protection by the Supreme Court. As a matter of law, customers who purchased the Book did so with an expectation that their purchase would remain a private matter. *Tattered Cover*, 44 P.3d at 1054 ("the First Amendment protects one's right to … purchase reading materials anonymously"). Violating these customers' constitutional rights for the reasons set forth by Rubenstein – namely, to provide another form of notice of a class action – hardly rises to the level of a compelling interest. Indeed, it is unimaginable that a police department (*Tattered Cover*) and an Independent Counsel (*Kramerbooks*) would be denied access to bookseller's data, but a civil litigant whose only goal is to provide more notice to certain book purchasers of this lawsuit would be permitted such access. This is particularly true in light of the sensitive topic of the Book, which deals with drug and alcohol addiction and recovery.

Nor can the alleged need for the information sought justify this extreme intrusion into First Amendment rights. The settlement agreement already provides a reasonable and

commonly used means for providing notice to these same class members – publication notice. Courts have routinely approved the use of publication notice in a wide array of consumer class actions, and thus there is no reason that publication notice could not be used here. *See, e.g., Reppert v. Marvin Lumber & Co.*, 359 F.3d 53, 57 (1st Cir. 2004) (publication notice sufficient for class members who did not purchase product directly from manufacturer); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 252 (D. Del. 2002) (notice published in magazines and newspapers reasonable in large consumer pharmaceutical class action); *Tylka v. Gerber Prods. Co.*, 182 F.R.D. 573, 578 (N.D. Ill. 1998) (consumer class action involving baby food is "not one in which members can be informed individually;" publication in several newspapers was adequate). Notice by publication, especially, as here, when the campaign is expansive, in combination with the information on the internet and the national media attention, can successfully reach potential class members while still preserving the anonymity of purchasers of the Book.

In fact, Rubenstein does not even attempt to balance the class members' First Amendment rights against her demand that those rights be trampled in this proceeding. Nor could she. The data produced in confirmatory discovery makes clear that class members have not been clamoring for relief such that infringing their First Amendment rights is the responsible approach. Despite the extensive media coverage that has surrounded the Book in the past year, few readers have returned the Book. From January 1, 2006 through October 2, 2006, Random House received only approximately 250 requests for a refund. *See* RH 00073, at ¶ 5. In addition, the overall return rate for the Book through September 30, 2006 is only about one-third of the average return rate for Random House non-fiction trade paperbacks over the last three years. *See* RH 00006, at ¶ 7. The Book's sales numbers also remain strong. *Id*. at ¶ 6. From January 26,

2006 through October 8, 2006, the Book remained on the New York Times Best Seller List for a total of 26 weeks, including 15 weeks as a top-five best seller.  *Id.*

Finally, Rubenstein's unsupported assertion that e-mailed notice would be "far more effective" in reaching the portion of the class that purchased the book on-line (Opposition at 6) is a nothing more than a guess.  Rubenstein does not even attempt to quantify the impact of her demand, and she makes no showing that such notice would be more effective.  But even assuming that e-mailed notice would be more effective, that improvement alone fails to justify the intrusive subpoena-based campaign that Rubenstein envisions.

# CONCLUSION

As the Court is aware, Defendants have agreed to a comprehensive notice program in the settlement agreement with the AMLP Group. Defendants sincerely hope that all class members who wish to avail themselves of the relief offered by the settlement agreement do so. However, the readers' First Amendment rights trump Rubenstein's request that this Court require booksellers to disclose – through subpoena or otherwise -- the identity of readers who purchased the Book on-line. Moreover, the drastic approach Rubenstein advocates is entirely needless given the availability of published notice. Rubenstein's notice arguments should be rejected.

Respectfully submitted,

By: _____ s/Mark B. Blocker _____        By: _____

Attorneys for Defendants Random House, Inc.,        Attorneys for Defendants James Frey, Maya
Doubleday & Company, Inc., and Random        Frey, and Big Jim Industries, Inc.
House V.G., Inc.

Mark B. Blocker        Derek J. Meyer
Michael C. Andolina        Jocelyn D. Franceour
Marissa J. Reich        MCDERMOTT WILL & EMERY
SIDLEY AUSTIN LLP        227 West Monroe
One South Dearborn Street        Chicago, IL 60606
Chicago, IL 60603        Telephone: (312) 372-2000
Telephone: (312) 853-7000        Facsimile: (312) 984-7700
Facsimile: (312) 853-7036

*Of Counsel:*

Stephen G. Contopulos
Jennifer A. Ratner
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, California 90013
(213) 896-6000

Dated: February 8, 2007

# EXHIBIT A

public hatred, contempt, or ridicule, or cause her to be shunned and avoided. See *Renwick,* 310 N.C. at 318, 312 S.E.2d at 409. Because the publications do not rise to the level of being defamatory *per se,* the trial court did not err in dismissing plaintiff's libel *per se* and slander *per se* claims.

Neither is plaintiff's claim actionable as "secondary libel." A claim of secondary libel must allege that the publication "is susceptible of two meanings, one defamatory, and that the defamatory meaning was intended and was so understood by those to whom the publication was made." *Id.* at 317, 312 S.E.2d at 409. Because plaintiff failed to allege in her complaint that the publication was susceptible of two meanings, one of which was defamatory, she failed to state a claim for secondary libel and the trial court did not err in dismissing it.

We find plaintiff's claims of defamation *per quod* equally unavailing. Defamation *per quod* requires an allegation that some special damage has occurred by the time the publication was made. *Tallent v. Blake,* 57 N.C. App. 249, 291 S.E.2d at 340, "In the law of defamation, special damages means pecuniary loss. Emotional distress and humiliation, alone are not enough to support a claim actionable *per quod. Id.* Plaintiff's complaint alleges "special damages such as loss of reputation in her profession, loss of career advancement potential, and bodily injury including emotional distress." Because plaintiff's complaint alleged only potential pecuniary damage, she has failed to state claims for defamation *per quod* and the trial court properly dismissed them.

We next address plaintiff's claims for intentional and negligent infliction of emotional distress.

The essential elements of the tort of intentional infliction of emotional distress are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress. *Dickens v. Puryear,* 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981)." The tort may also exist when there is a reckless indifference to the likelihood that emotional distress may result. *Id.* (citing *Dickens v. Puryear,* 302 N.C. 437, 449, 276 S.E.2d 325, 333 (1981)).

The determination of whether the conduct can reasonably be regarded as extreme and outrageous is, at least initially, a question for the court. *See Hogan v. Forsyth Country Club Co.,* 79 N.C. App. 483, 490-91, 340 S.E.2d 116, 121, *disc. review denied,* 317 N.C. 334, 346 S.E.2d 140 (1986).

the publication must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Briggs v. Rosenthal,* 73 N.C. App. 672, 677, 327 S.E.2d 308, 311, *cert. denied,* 314 N.C. 115, 332 S.E.2d 481 (1985) (quoting Restatement (Second) of Torts §46, Comment d).

Under this standard, we find that the publications in this case could not reasonably be regarded as outrageous. Although the statements complained of were made by a young, unidentified resident and repeated by Joyner. Unlike the defendant in *Chapman v. Byrd,* 124 N.C. App. 13, 20, 475 S.E.2d 734, 739 (1996), defendant here did not accuse plaintiff of having a fatal or communicable disease. In *Chapman,* the defendant told the citizens of the area's "highly credible in the eyes of credibility, by the statements was not necessarily the statements was not so, the [Given this lack of credibility, the likelihood of harm to plaintiff was not so extremely high, and the statements were not tremendly high, and the statements did not address the issues arising by reason of defendant's conduct. Cf. id.

To state a claim for negligent infliction of emotional distress, "a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress (sometimes referred to as 'mental anguish'), and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Johnson v. Ruark Obstetrics,* 327 N.C. 283, 304, 395 S.E.2d 85, 97, *reh'g denied,* 327 N.C. 644, 399 S.E.2d 133 (1990).

To state a claim for negligent infliction of emotional distress, plaintiff must allege and prove that she has suffered severe emotional distress as a "proximate and foreseeable result of the defendant's negligence." *Id.* To establish a claim for negligent infliction of emotional distress, "the law requires reasonable foresight of an emotional or mental condition, and severe emotional or mental condition." *Gardner v. Gardner,* 334 N.C. 662, 667, 435 S.E.2d 324, 328 (1993). Here as in *Gardner,* there is no allegation that defendant knew plaintiff was subject to an emotional or mental disorder or other severe and disabling emotional or mental distress. Thus, under the law of this State, the question of whether defendant's conduct and its consequences, "Absent such knowledge, such an outcome cannot be held to be reasonably forseeable," *id.,*

and plaintiff fails to state a claim for negligent infliction of emotional distress describing and negligent infliction. Plaintiff's claim for unfair and deceptive trade practices. Because we found above that plaintiff failed to state claims for defamation, her claim under N.C. Gen. Stat. §75-1.1 et seq. (1994 & Supp. 1990) cannot be maintained. *See Ellis v. Northern Star Co.,* 326 N.C. 219, 225, 388 S.E.2d 127, 131, *reh'g denied,* 326 N.C. 488, 392 S.E.2d 89 (1990) (Court declined to consider unfair and deceptive trade practices claim based on libel claim, when jury found no libel). The trial court properly dismissed plaintiff's unfair and deceptive trade practices claim.

Having determined that plaintiff failed to state a claim for relief we do not address the issues arising by reason of defendants' affirmative defenses. For the foregoing reasons the instant case is affirmed.

Affirmed.

Judges EAGLES and McGEE concur.

---

### IN RE GRAND JURY SUBPOENA TO KRAMERBOOKS & AFTERWORDS INC.

U.S. District Court
District of Columbia

IN RE GRAND JURY SUBPOENA TO KRAMERBOOKS & AFTERWORDS INC; IN RE GRAND JURY SUBPOENA TO BARNES & NOBLE INC; Misc. Action Nos. 98-135 (NHJ) and 98-138 (NHJ), April 6, 1998

#### NEWSGATHERING

1. Forced disclosure of information — Disclosure of unpublished information — In general (§60.0100)

Forced disclosure of information — Common law privilege (§60.20)

Subpoenas issued by office of independent counsel to two bookstores seeking titles of books purchased by former White House intern chilled their First Amendment rights and those of intern,

and office must submit ex parte filing describing its need for specific information sought from bookstores and grand jury investigation.

Motion by non-party bookstores and former White House intern seeking to quash subpoenas issued by office of independent counsel ordered to submit ex parte filing describing its need for materials sought and connection between information sought and grand jury investigation.

*Full Text of Opinion*

Johnson, J.:

The Independent Counsel has issued a subpoena to Kramerbooks & afterwords, Inc. ("Kramerbooks"), an independent bookstore and cafe in in Dupont Circle. The subpoena requests "all documents and things reflecting any purchase by Monica Lewinsky from November 1995 to the present, including but not limited to certain purchases made by check. Both Kramerbooks and Monica Lewinsky have moved to quash subpoenas. Barnes & Noble, a national chain of bookstores, has received a subpoena directed to one of its local stores, and has moved to quash that subpoena.[1] Before the Court are also briefs motions to certain purchases made filed by amici curiae in support of the motions to quash: one from the American Civil Liberties Union and the National Capital Area and another from the American Booksellers Foundation for Free Expression et al.

The Office of Independent Counsel ("OIC") contends that the Court's decision in *United States R. Enterprises,* 498 U.S. 292 (1991), governs the outcome of the motions to quash. In *R. Enterprises,* a federal grand jury issued subpoenas to three companies in the subpoena to three companies in the subpoena. *Id.* at 294. The subpoenas in that case sought corporate books and records of interstate transportation of obscene materials. *Id.* at 294. The subpoenas in that case sought corporate books and rec-

[1] The Court finds that Kramerbooks and Barnes & Noble have standing to challenge the subpoena. *See Virginia v. American Booksellers Association,* 484 U.S. 383, 392-93 [14 Med. L.Rptr. 2145] (1988).

26 Med. L. Rptr. 1600     In re Grand Jury Subpoena to Kramerbooks & Afterwords Inc.

ords as well as copies of videotapes and ... the companies moved to quash the subpoenas, arguing that the materials sought were irrelevant to the grand jury's investigation and that the enforcement of the subpoenas was likely to infringe upon their First Amendment rights. *Id.* at 294-95.

The *R. Enterprises* Court decided that the movants' relevancy argument was unavailing because there existed a "reasonable possibility that the category of materials sought would produce information relevant to the general subject of the grand jury's investigation." *Id.* at 301. The Court went on to state: "The Court of Appeals determined that the subpoenas did not satisfy Rule 17(c) and thus did not address the relevancy argument. We express no view on this issue and leave it to be resolved by the Court of Appeals." *Id.* at 303. Because it did not address the First Amendment question at issue here, *R. Enterprises* does not end the Court's inquiry.

The Court finds ineluctable that First Amendment rights are implicated by the subpoenas to Kramerbooks and Barnes & Noble. The First Amendment right to receive ideas "follows ineluctably from the sender's ... right to send them" and "is a necessary predicate of the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Board of Education v. Pico,* 457 U.S. 853, 867 (1982); *see also Kleindienst v. Mandel,* 408 U.S. 753, 762 (1972) ("In a variety of contexts this Court has referred to a First Amendment right to receive information and ideas."); *Griswold v. Connecticut,* 381 U.S. 479, 482 ("The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read....").

It is apparent that the materials sought by the subpoenas would reveal the titles of books purchased by Ms. Lewinsky, whose First Amendment rights are at issue here. *See Virginia v. American Booksellers Association,* 484 U.S. 383, 393 [14 Med.L.Rptr. 2145] (1988) (recognizing First Amendment rights of booksellers). Kramerbooks and Barnes & Noble are also engaged in constitutionally protected expressive activities. "The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication...." *Bantam Books v. Sullivan,* 372 U.S. 58, 65 n.6 [1 Med.L.Rptr. 1116] (1963). Justice Douglas emphasized the First Amend-

ment implications of revealing an individual's book purchases: "A requirement that a publisher disclose the identity of those who buy his books, pamphlets, or papers is indeed the beginning of surveillance of the press.... [I]t would be a barrier to a free press. Some will watch the 'patently offensive channel'"). *Lamont v. Postmaster General,* 381 U.S. 301, 307 (1965) (finding unconstitutional the requirement that viewers must affirmatively request certain programming because such a requirement is ... almost certain to have a deterrent effect").

[1] The bookstores and Ms. Lewinsky have persuasively alleged a chilling effect on their First Amendment rights. Many customers have withdrawn their patronage of the bookstore because they believed that the titles of books they purchased would be turned over to the OIC that would reveal a patron's choice of books. Kramer Decl. at ¶17. Sales at the bookstore have also declined, *id.* at ¶18, and the store was picketed by a group of .... intrusion and embarrassment. Kramerbooks's Mot. to Quash at p. 6.

The Supreme Court has never explicitly defined the standard under which a grand jury subpoena that implicates the First Amendment will be examined, though, as has been noted, "We do not expect that courts will forget that grand juries must operate within the limits of the First Amendment." *Branzburg v. Hayes,*

In re Grand Jury Subpoena to Kramerbooks & Afterwords Inc.     26 Med. L. Rptr. 1601

408 U.S. 665, 710 [1 Med.L.Rptr. 2617] (1972), in *Branzburg v. Hayes,* 863 F.2d 667, 670 (9th Cir. 1988). Second, the government must also show a sufficient connection between the information sought and the grand jury investigation where there is a First Amendment challenge to a grand jury investigation into the commission of crime just as any citizen would. The Court found that the First Amendment did not apply to prevent the testimony, "neither the First Amendment nor any other constitutional provision protects the average citizen from disclosing to a grand jury information ... that he has received in confidence." *Id.* at 682. The Court stated that, "[I]f the test is that the government must demonstrate a compelling interest in the information sought and a 'convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest.'" *Id.* at 700-01 (citation omitted).

That test has been adopted by the courts of appeal facing the question of a grand jury subpoena. First, the government must demonstrate a compelling interest in the information sought or a compelling need for the information sought"), *cert. denied* 117 S.Ct. 432 (1996); *In re Grand Jury Proceedings,* 776 F.2d 1099, 1102-03 (2d Cir. 1985) (holding that state interests must be "sufficiently important to outweigh the possibility of infringement of the First Amendment by a grand jury subpoena); *In re Grand Jury Subpoena,* 701 F.2d 115, 119 (10th Cir. 1983) (holding that, if a grand jury subpoena would chill associational rights, the government "must show a compelling need to obtain documents identifying petitioners' members"); *Bursey v. United States,* 466 F.2d 1059, 1083 (9th Cir. 1972) (holding that, because criminal activity collides with First Amendment rights, the Government has the burden of establishing that its interest are legitimate and compelling and that the incidental infringement upon First Amendment rights is no greater than is essential to meet the government's interests"), *overruled in part on other*

grounds, *In re Grand Jury Proceedings,* 78 F.3d 1307, 1312 [8th Cir.] (holding that "a grand jury subpoena will be enforced despite a First Amendment challenge if the government can demonstrate ... a sufficient nexus between the information sought by a grand jury subpoena and ... a compelling state interest ... then that test was met in that case. *Id.* at 700-01 (citation omitted).

Accordingly it is this 6th day of April 1998,

ORDERED that the Office of Independent Counsel has a compelling need for the materials it seeks and whether there is a sufficient connection between that information and the grand jury's investigation. Because the OIC did not ... to make such a submission, the Court will order that it do so at this time.

Accordingly it is this 6th day of April 1998,

ORDERED that the Office of Independent Counsel has a compelling need for the materials sought by the subpoenas to Kramerbooks and Barnes & Noble and the connection between the information sought and the grand jury investigation, no later than Thursday, April 9, 1998, at 5:00 pm.

## ORDER

Before the Court are two motions of *amici curiae.* The Court has previously granted the motion of the American Booksellers Foundation for Free Expression et al. ("American Booksellers") for leave to file a brief as *amicus curiae.* Now the American Booksellers move to file their amicus brief on the public record. Also pending is the motion of the American Civil Liberties Union and the American Civil Liberties Union of the National Capital Area for leave to file a memorandum of law as *amici curiae* in support of a grand jury subpoena. After consideration of these motions, it is this 6th day of April 1998.

ORDERED that the motion of the American Booksellers Foundation for Free Expression et al. for leave to file their amici curiae brief in support of the public records demand of Kramerbooks be, and hereby is, granted; and it is further

ORDERED that the motion of the American Civil Liberties Union and the American Civil Liberties Union of the National Capital Area for leave to file their amici curiae brief in support of Kramerbooks' motion to quash a grand jury subpoena be, and hereby is, granted; it is further

ORDERED that the motions of amici curiae American Booksellers Foundation for Free Expression et al., and the American Civil Liberties Union and the American Civil Liberties Union of the National Capital Area in support of the motion of Kramerbooks be, and hereby are, unsealed.

---

## MILSAP v. STANFORD

U.S. Court of Appeals
Seventh Circuit
(Unpublished)

JAMES W. MILSAP v. GREGORY D. STANFORD, No. 95-C-0086, March 9, 1998.

### REGULATION OF MEDIA CONTENT

**1. Defamation — Retraction (§11.47)**

Federal district court in Wisconsin did not err by dismissing plaintiff former job training center director's libel action, based on statement in newspaper column that he "simply renegged" on paying defendants, where plaintiff failed to comply with requirements of Wis. Stat. Section 895.05(2), since his retraction demand letter failed to identify offending statement and contained no statement of what plaintiff claimed to be true facts. (25 Med.L.Rptr. 1046).

Libel action against newspaper, reporter, editorial page editor, and attorney in charge of newspaper's legal department. The U.S. District Court for the District of Minnesota granted defendants' motion to dismiss for lack of personal jurisdiction. (25 Med.L.Rptr.

1349). The U.S. District Court for the Eastern District of Wisconsin granted defendants' motion for summary judgment, and judgment entered for U.S. Court of Appeals for the Seventh Circuit affirmed in part, reversed in part, and remanded (25 Med.L.Rptr. 1046). From decision of the U.S. District Court for the Eastern District of Wisconsin on remand, for libel claim, plaintiff appeals.

Affirmed.

[Editor's Note: The U.S. Court of Appeals for the Seventh Circuit has designated this decision as an "unpublished" order not to be cited per Circuit Rule 53.]

**Full Text of Opinion**

Before Ripple, Manion, and Rovner, JJ.

This successive appeal concerns an editorial column written by Gregory Stanford, containing a statement that James Milsap alleges is defamatory. In 1989, Stanford's column appeared in the Milwaukee Journal-Sentinel, a local newspaper, and Stanford worked at the newspaper as a columnist. The column concerned how Milsap was able to afford certain personal items, stating "if my case was typical...." [Milsap] reneged on paying people.

Initially, Milsap brought a variety of claims, including defamation, against Stanford, a second columnist, the newspaper that published the article, and two other Milwaukee Journal employees. The district court granted summary judgment in favor of the defendants on all claims. Milsap appealed, challenging only the defamation claim, and this court held that Stanford's statement that Milsap "renegged on paying people was actionable, but only to the extent it suggested that Milsap had failed to pay Stanford. Milsap v. Journal/Sentinel, Inc., 100 F.3d 1265, 1268 [25 Med.L.Rptr. 1046] (7th Cir. 1996). We remanded the case only with respect to the article, Stanford and his statement that Milsap reneged on paying him. Id. at 1271. On remand, the district court dismissed the case pursuant to Fed.R.Civ.P 12(b)(6), finding that Milsap had not complied with the requirements of Wis. Stat. §895.05(2) prior to

commencing his action. Milsap now appeals.

The only issue before this court is whether Milsap filed a sufficient retraction demand letter as is required under Wis. Stat. §895.05(2). Prior to the commencement of a civil action for libelous publication, §895.05(2) requires that any person responsible for the alleged libelous statement be given the opportunity to correct the statement through proper notice. As the *Hucko* court detailed, §895.05(2) requires that such "notice must (1) be in writing; (2) be directed to those claimed to be responsible or liable; (3) specify the article, count or section which are claimed to be false and defamatory; (4) specify the statements therein which are claimed to be false and defamatory; and (5) request before any civil action is commenced that they be retracted." *Hucko v. Joseph Schlitz Brewing Co.*, 302 N.W.2d 68, 70 [Wis. Ct. App. 1981]. As the *Hucko* court found, §895.05(2) requires that such "notice must (1) be in writing; (2) be directed to those claimed to be responsible or liable; (3) specify the article or section which are claimed to be false and defamatory; (4) specify the statements therein which are claimed to be false and defamatory; and (5) request before the true facts, and (5) be given before any civil action is commenced that they be retracted." The district court found that Milsap failed to identify the offending statement set forth in Stanford's article, which was set clear when the article was compared with the statement of true facts as required under §895.05(2). *Hucko*, 302 N.W.2d at 75, n. 9. The court concluded that "[w]hile for the purposes of this appeal we find this sufficient under sec. 895.05(2), we note that the statute requires that the false statements contained in each article or be specif-

On appeal, Milsap argues that his demand letter to Stanford with demand letter identified the article and implied that it was misleading, he failed to specify the statement that he "renegged on paying people" was false and defamatory. While the letter identified the particular statement alleged to be actionable, according to Milsap, §895.05(2) simply requires that the person alleged to be responsible for the publication provided the opportunity to correct the libelous material. He argues that a letter provided that opportunity. He argues that Milsap claims that his letter provided that opportunity. He argues that the Journal's legal department, which references the Stanford statement, demonstrates that Stanford had sufficient notice of the particular statement. Milsap, however, failed to raise the argument that the retraction letter evinces his compliance with §895.05(2) to the district court, and waived this argument.[1]

*Life Ins. Co.*, No. 96-3646, [3d 1998). We will therefore consider only whether the district court erred in finding that Milsap's demand letter failed to comply with the requirements of §895.05(2).

Both parties, as well as the district court, rely on *Hucko* to determine what constitutes a proper demand letter under §895.05(2). However, the application of §895.05(2) to the particular demand letter in *Hucko* did not directly address the particular demand letter at issue here, but did not directly address the necessary elements of a demand letter, but did not apply these requirements strictly. Although the demand letter in *Hucko* did not identify the allegedly defamatory statements, the letter contained a detailed statement of true facts. In a footnote, the *Hucko* court observed that the alleged defamatory statements in the article became clear when the article, which was set forth in the demand letter, was compared with the statement of true facts, and that the letter contained a statement that "[w]hile for the purposes of this appeal we find this sufficient under sec. 895.05(2), we note that the statute requires that the false statements contained in each article or be specif-

[1] Although Milsap's retraction demand letter identified the article and implied that it was misleading, he failed to specify the statement that the "renegged on paying people" statement was false and defamatory. While the letter identifies the particular statement, it is not sufficient under §895.05(2) to assume that the person alleged to be responsible for a libelous statement will be able to deduce which statement is alleged to be false. The purpose of §895.05(2) is to provide the allegedly responsible person with notice of the allegedly specific statement

[1] Even if we considered Milsap's assertion, we are not persuaded that Stanford had notice of the particular offending statement. Instead, the author of the response letter stated that "After reading [Milsap's] demand letter, I did not feel that a good deal of exactly which words or phrases were generating your complaint." The author, therefore, addressed each statement that Milsap invited the author, therefore, addressed each statement and to submit evidence that he had a good deal of exactly which statements were generating your complaint. The author, therefore, addressed each statement and to submit evidence that Milsap specify the statements, in fact, were false and

## CERTIFICATE OF SERVICE

I, Marissa J. Reich, hereby certify that I filed Defendants' Response to the Opposition of Plaintiff Sara Rubenstein to Address First Amendment Issues via the ECF system of the Southern District of New York and served copies of the foregoing papers upon the following counsel by U.S. mail this 8th day of February, 2007:

ATTORNEY FOR PLAINTIFF MICHELE SNOW:

> Evan J. Smith
> Brodsky & Smith, LLC
> 240 Mineola Blvd.
> Mineola, NY 11501
> Tel: 516-741-4977
> Fax: 610-667-9029

ATTORNEY FOR PLAINTIFF JIMMY FLOYD:

> Alan S. Ripka
> Napoli Bern Ripka
> 115 Broadway
> New York, NY 10006
> Tel: 212-267-3700

ATTORNEY FOR PLAINTIFFS JENNIFER COHN and DIANE MAROLDA:

> Thomas M. Mullaney
> Law Offices of Thomas M. Mullaney
> 708 Third Avenue, Suite 2500
> New York, NY 10017
> Tel: 212-223-0800
> Fax: 212-661-9860

ATTORNEY FOR PLAINTIFF PILAR MORE:

> Thomas E. Pakenas
> Dale & Pakenas
> 641 West Lake Street, Suite 400
> Chicago, IL 60661
> Tel: 312-258-1800
> Fax: 312-258-1804

ATTORNEY FOR PLAINTIFF ANN MARIE STRACK:

> Thomas A. Zimmerman, Jr.
> Zimmerman & Associates, P.C.
> 100 West Monroe, Suite 1300
> Chicago, IL 60603
> Tel: 312-440-0020
> Fax: 312-440-4180

ATTORNEY FOR PLAINTIFFS GARRETT HAUENSTEIN and JEAN TAYLOR:

> Christopher W. Taylor
> Gancedo & Nieves, LLP
> 144 West Colorado Boulevard
> Pasadena, CA 91105
> Tel: 626-685-9800
> Fax: 626-685-9808

ATTORNEYS FOR PLAINTIFF SARA
RUBENSTEIN:

> James P. Bonner
> Shalov Stone & Bonner LLP
> 485 Seventh Avenue, Suite 1000
> New York, NY 10018
> Tel: 212-239-4340
> Fax: 212-239-4310
>
> Mitch Kalcheim
> Kalcheim Salah
> 2049 Century Park East, Suite 2150
> Los Angeles, CA 90067
> Tel: 310-461-1200
> Fax: 310-461-1201

ATTORNEY FOR SHERA PAGLINAWAN
and WENDY SHAW:

> Michael David Myers
> Myers & Company, PLLC
> 1809 Seventh Avenue, Suite 700
> Seattle, WA 98101
> Tel: 206-398-1188

ATTORNEYS FOR PLAINTIFF MARCIA
VEDRAL:

> John H. Alexander
> John H. Alexander & Associates, LLC
> 100 West Monroe, 21st Floor
> Chicago, IL 60602
>
> Larry Drury
> Larry D. Drury, Ltd.
> 205 W. Randolph Street, Suite 1430
> Chicago, IL 60606
> Tel: 312-346-7950
> Fax: 312-346-5777

ATTORNEYS FOR PLAINTIFF GREGORY
RIVARD:

> Mark S. Baumkel
> Provizer & Phillips, P.C.
> 30200 Telegraph Road, Suite 200
> Bingham Farms, MI 48025
> Tel: 248-642-0444
> Fax: 248-642-6611
>
> E. Powell Miller
> Miller Shea, P.C.
> 950 W. University Drive, Suite 300
> Rochester, MI 48301

ATTORNEYS FOR PLAINTIFF JILL GILES:

> Scott C. Frost
> Statman, Harris, Siegel & Eyrich, LLC
> 333 West Wacker Drive, Suite 1710
> Chicago, IL 60606
> Tel: 312-263-1070
> Fax: 312-263-1201
>
> Alan J. Statman
> Statman, Harris, Siegel & Eyrich, LLC
> 2900 Chemed Center
> 255 E. Fifth Street
> Cincinnati, OH 45202
> Tel: 513-621-2666

ATTORNEYS FOR DEFENDANT SEAN
MCDONALD:

> Alex Giganle, General Counsel
> Penguin Group (USA) Inc.
> 375 Hudson Street
> New York, NY 10014
> Tel: 212-366-2000
> Fax: 212-366-2687

2

ATTORNEYS FOR DEFENDANT ANCHOR
BOOKS:

    Fred B. Burnside
    Davis Wright Tremaine LLP
    1501 4th Ave., Suite 2600
    Seattle, WA 98101
    Tel: 206-622-3150
    Fax: 206-628-7699

DEFENDANT:

    Kassie Evashevski
    Brillstein Grey
    9150 Wilshire Blvd.
    Beverly Hills, CA 90212

ATTORNEYS FOR DEFENDANT BARNES
& NOBLE:

    Brad Feuer
    General Counsel
    Barnes & Noble, Inc.
    122 Fifth Avenue
    New York, NY 10011
    Tel: 212-633-3300
    Fax: 212-463-5683

ATTORNEYS FOR PLAINTIFF SARA
BRACKENRICH:

    Brian C. Witter
    DiTommaso Lubin
    17 West 220
    22nd Street
    Oakbrook Terrace, IL 60181
    Tel: 630-333-0000
    Fax: 630-333-0333

CH1 3733340v.1

3