1

```
       746zmdlm
  1    UNITED STATES DISTRICT COURT
  1    SOUTHERN DISTRICT OF NEW YORK
  2    ------------------------------x
  2
  3    IN RE: A MILLION LITTLE PIECES
  3    LITIGATION
  4
  4
  5
  5                                    06 CV 669 (RJH)
  6
  6
  7    ------------------------------x
  7
  8                                    April 6, 2007
  8                                    10:10 a.m.
  9
  9    Before:
 10
 10              HON. HOLWELL: RICHARD J. HOLWELL,
 11
 11                                    District Judge
 12
 12                    APPEARANCES
 13
 13    BRODSKY & SMITH, L.L.C.
 14         Attorneys for Plaintiff Snow
 14    BY:  EVAN J. SMITH
 15
 15    LAW OFFICES OF THOMAS M. MULLANEY
 16         Attorneys for Plaintiffs Cohn and Marolda
 16    BY:  THOMAS M. MULLANEY
 17
 17    LARRY DRURY, LTD.
 18         Attorneys for Plaintiff Vedral
 18    BY:  LARRY DRURY
 19
 20    GANCEDO & NIEVES, LLP
 20         Attorneys for Plaintiffs Hauenstein and Taylor
 21    BY:  CHRISTOPHER W. TAYLOR (Via telephone)
 22    SHALOV STONE BONNOR & ROCCO LLP
 22         Attorneys for Rubenstein
 23    BY:  JAMES BONNOR
 24
 25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

```
746zmdlm
 1   APPEARANCES:(continued)
 2   SIDLEY AUSTIN, LLP
 2        Attorneys for Defendants Random House and Doubleday
 3        BY: MARK B. BLOCKER
 3            MICHAEL ANDOLINA
 4
 5   MCDERMOTT WILL & EMERY
 5        Attorneys for Defendant James Frey
 6        BY:  DEREK J. MEYER
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

746zmdlm
```
1              THE COURT:  Please, take your seats.
2              (Case called)
3              THE DEPUTY CLERK:  Counsel, please state your name for
4     the record.
5              MR. SMITH:  Kevin Smith from Brodsky & Smith on behalf
6     of plaintiff, Michelle Snow individually, and on behalf of the
7     Million Little Pieces plaintiffs group.
8              MR. DRURY:  Larry Drury from Larry Drury, Ltd. on
9     behalf of Marcia Vedral and the putative class.
10             THE COURT:  Mr. Drury.
11             MR. MULLANEY:  Thomas M. Mullaney for plaintiff Diane
12    Marolda.
13             THE COURT:  Mr. Mullaney.
14             MR. BONNOR:  Good morning, your Honor.  Jim Bonnor
15    with Shalov Stone Bonnor & Rocco for plaintiff Sarah
16    Rubenstein.
17             MR. MEYER:  Good morning.  Rick Meyer on behalf of
18    James Frey.
19             MR. BLOCKER:  Good morning, your Honor.  Mark Blocker
20    on behalf of defendant Random House.
21             MR. ANDOLINA:  Good morning, Judge.  Michael Andolina,
22    also on behalf of defendant Random House.
23             THE COURT:  All right.  This is -- and who do we have
24    on the phone, counsel?
25             MR. TAYLOR:  Chris Taylor, counsel for plaintiff
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

746zmdlm
```
 1   Hauenstein.
 2          THE COURT:  Okay.  This is a motion for preliminary
 3   approval of a settlement and for certification of the class.
 4   I've read the papers.
 5          There are some issues in dispute which I'm prepared to
 6   hear from counsel on briefly.  Perhaps one of the three
 7   proponents for the motion might briefly address it.
 8          MR. DRURY:  May I use the podium, your Honor?
 9          THE COURT:  Yes, feel free.
10          MR. DRURY:  Thank you.
11          Please the Court, counsel, as I said, my name is Larry
12   Drury.  I'm here on behalf of plaintiff Vedral and the putative
13   class.
14          Your Honor, having stated that you've read all of the
15   materials, I'd just like to briefly highlight a few points if I
16   may.
17          THE COURT:  Yes.
18          MR. DRURY:  As the Court is aware, this case has to do
19   with the book known as A Million Little Pieces, which was
20   written by one James Frey.  It was published in hard cover form
21   in 2003, and in 2004 and five came out in paperback form.
22          One of the questions that arose as a result of this
23   book was the misrepresentations or embellishments or however
24   the Court deems appropriate as to what was said.  For example,
25   there were statements in the book as to Mr. Frey having been in
```

5

746zmdlm

1   jail for three months, when it was three days; his girlfriend
2   having died, when she didn't; having a tooth removed without
3   any anesthetic.
4           As time went on, it became clear that, indeed, that
5   was not the fact, and as disclosed in the smoking gun in 2006
6   in the Larry King show, and in January 26 of '06 on the Oprah
7   Winfrey show, with tears in her eye, James Frey came forth and
8   said that it wasn't exactly accurate.
9           Now, that's a very brief background what gets us here
10  today.  As a result of that, there were lawsuits filed all over
11  the country.  They were eventually gone to the MDL and they
12  were consolidated and transferred to your Honor.
13          The matter's now before you for preliminary approval
14  of the settlement, approval of notice, approval of class
15  counsel and class representatives.
16          Interestingly, your Honor, that since all of this took
17  place, the book itself still remained on the best seller list
18  for some 26 weeks subsequent to January of '06.  There was also
19  sales that exceeded some 93,000 books.  And the comments that
20  came in, as we've seen with respect to the books, were more on
21  the favorable side than critical.  And I think it's important
22  to note that, indeed, it remained on the best seller list.  And
23  why I mention that and these 93,000 in sales and less than 250
24  returns of the book is one of the reasons that we're here for
25  settlement, because there is a lot of questions as to how the

6

746zmdlm
```
 1   public and the class, which we seek to represent, has reacted
 2   to all of this.  And the reaction seems to be, in some part,
 3   that they weren't substantially concerned.  There was only 250
 4   returns of the book.
 5           Now, a little additional background, your Honor.  We
 6   formed the plaintiffs' group early on, and it consisted of some
 7   12 firms.  Now there's two that are no longer with.  One is on
 8   the phone, Mr. Taylor, and Mr. Bonnor is here also.  And we had
 9   meetings with the defendants.  I attended them personally.  Mr.
10   Smith was there on one occasion; he was there telephonically.
11   We negotiated at arm's length what we considered a fair,
12   reasonable and adequate settlement.
13           We met in Chicago many many times.  We went back and
14   forth.  We had numerous disputes as to where we stand and where
15   we stood with the position.  We insisted on confirmatory
16   discovery.  And the confirmatory discovery consisted of sales
17   returns, pricing, royalties, review of some 2,000 documents and
18   declarations from three or four sources as to the sales of the
19   books, the returns of the book and the royalties which Mr. Frey
20   took into place.  These negotiations began in around April
21   or -- March or April or so, and we entered into an MOU, a
22   memorandum of understanding July 26, '06.
23           In between, we've done substantial work in drafting
24   the pleadings, responding to would-be objectors, going over the
25   notice, continual discussion with the defendants in attempt to
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

7

746zmdlm
```
 1   resolve the case.
 2           We believe we have put before your Honor what we
 3   consider to be a fair, adequate and reasonable settlement well
 4   within the range of reasonableness which would allow the Court
 5   to grant the preliminary approval so that notice could go out
 6   to the class and the class could be made aware of what the
 7   settlement is, have an opportunity to respond, to exclude
 8   themselves, to object, to make a claim, and/or attend the final
 9   fairness hearing if your Honor decides to preliminarily
10   approval the settlement today.
11           What does this settlement consist of?  I'm going to
12   just highlight a few matters.  One, there's a total fund of
13   $2,350,000 that is the settlement fund.  That fund is available
14   for all class members to make their claim.  And their claim
15   consists of a claim for the refund of the price of the book
16   regardless of what format it's in, hard cover, CD, paper back,
17   they will get a full refund, including taxes and if it was by
18   internet, shipping charges I believe are also included in that.
19   The maximum amount --
20           THE COURT:  They'll get a full refund if there are
21   only a limited number of claimants, right?  If all purchasers
22   were to file claims, their recovery would be something in the
23   range of 75 cents.
24           MR. DRURY:  Well, if there -- if the claims exceed the
25   total value of the fund, yes, there would be a pro rata
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

8

746zmdlm

1  reduction in the value of the claims that each class member
2  would get, that's correct.
3          And the $2,350,000 doesn't only include the refund
4  possibilities for the class, but also includes any attorneys
5  fees, costs, administrative costs and any other items such as
6  that, which is set forth in our moving papers which would be
7  deducted off the top of that $2,350,000.  So we don't know, and
8  I don't know as I stand here, what the take rate is going to
9  be; in other words, how many claims are going to be for class
10 members, but the way it's structured that is the full fund that
11 is available to the class.  As part --
12         THE COURT:  Tell me, then, why the Court should
13 consider this amount to be within a range, a reasonable range
14 for settlement.
15         MR. DRURY:  Our review of the financial records and
16 sales and returns and items such as that, your Honor, reveals
17 that the gross sales for these books would be around $55
18 million; generally discounted at 20 percent would be about $44
19 million.  It's our understanding from our discovery with the
20 defendants that that gross price is the price that's being sold
21 to the consuming public, but the price that the defendant,
22 Random House, for example, would have received would be
23 one-half of that.  So when they saw it on the market it's
24 double.  So that would take the 55 down to 22, or on the
25 discounted side if it was 44, it would take it down to --

746zmdlm

```
 1  excuse me -- 27 would be 22 on the 44, 27 on the 55.  Then
 2  there would be the royalties that are involved, which were some
 3  $4 million, which take it down to about 23, five on the gross
 4  sides and about 18 on the discount side.
 5          Then we'd have to calculate -- and we did as best we
 6  could -- what the profit would have been for the defendant
 7  based on those numbers, and we were looking at a profit of
 8  around 25 or 30 percent.  So that drops the number on the gross
 9  side from 55 million to $5,825,000.  On the discount side on
10  the 44 million, it would take it down to about 4,500,000.
11          Now to that equation, in looking to the risk involved
12  in litigation as opposed to resolution by settlement, balancing
13  those risks, weighing them, the possibilities of appeals,
14  possibility of a prolonged trial and lengthily discovery, we
15  had to put that into the equation the possibility of winning
16  and the possibility of losing.  I believe that 50-50 down the
17  middle is where we would be.  And if you apply that 50 percent
18  to these net numbers, that takes us down to the two million
19  seven, two million nine, two million four range.  That's how we
20  got to the $2,350,000 your Honor.
21          There's also another factor which I didn't include
22  into that calculation, but the defendants contend that we
23  should really take off maybe 10 percent from these numbers
24  because only 10 percent of the book was embellished by
25  falsities and misrepresentations -- of course those aren't
```

10

746zmdlm
1  their words, their words are embellishment, my words are
2  misrepresentation -- as made in the book by Mr. Frey, and that
3  would reduce it further.
4         So, considering all of those criteria, at this
5  juncture of the proceeding we feel as advocates for this
6  settlement that it would be in the best interests of the class
7  to settle it at this time for this amount of money.
8         Now, included in the settlement -- your Honor I'm sure
9  saw that there's a cy-pres provision, I'm not going to go
10 through all the details, and of course that will be up to your
11 Honor to finally approve, should you approve this settlement,
12 where the cy-pres distribution should go.
13        We've provided for notice.  The notice to the class is
14 by way of direct mail for those persons that Random House has
15 the addresses for.  We've also provided for publication notice
16 in Parade and U.S.A. Weekend.  There will be two publications
17 which will reach 50 states, 962 papers, and about 55,400,000 in
18 circulation.
19        We also looked at the fact that there's been a lot of
20 publicity and public attention to this.  And as we noted in our
21 moving papers there were comments on CNN, the Wall Street
22 Journal, the New York Times and the web sites that are
23 currently in place have for the settlement alone, over a
24 1,090,000 hits already of people showing interest in what's
25 going on here.  So we have mail, we have publication, we have
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

11

746zmdlm
1      the internet site.
2                THE COURT:  How many purchasers would --
3                MR. DRURY:  Excuse me?
4                THE COURT:  -- receive direct notice?
5                MR. DRURY:  I don't have an exact number.  I believe
6      the defendant is going to address the total amount in there.  I
7      don't know whether it was a thousand -- I really don't recall.
8      It's not that I don't know whether it was a thousand or under a
9      thousand that will receive the direct mail notice from Random
10     House.
11               THE COURT:  Did the plaintiffs consider a more
12     expansive direct notice?
13               MR. DRURY:  Of course, your Honor.  We considered all
14     aspects of what would be the best notice practicable under the
15     circumstances.
16               And while we're on the subject, I know that one of the
17     concerns expressed by the objector was, well, maybe we should
18     have sent subpoenas out to third parties to get their customer
19     list.  And I know of no cases or any law that would insist or
20     that would require any of the parties, plaintiffs or
21     defendants, to impose upon third parties by way of subpoena to
22     disclose their customer list, which they probably watch over
23     very closely and are protective of, it's business, it's their
24     customer lists or, alternatively, to require them to have to go
25     and make those lists and then first send them out.  This is not

12

746zmdlm

 1  like a securities case, which was referred to by the objectors.
 2  In the securities case we're dealing with brokerage houses and
 3  records and nominees, and fiduciary relationships and
 4  regulations where there's a requirement to keep such records.
 5  In this instance with retailers, for example, there is no
 6  requirement that they must maintain lists and --
 7          THE COURT:  There are some non parties -- there are
 8  some parties, rather, defendant parties who are retailers.
 9  They're not parties to the settlement agreement, but --
10          MR. DRURY:  Yes.
11          THE COURT:  -- are they still parties to the
12  litigation?
13          MR. DRURY:  Yes.  There's a -- some of the numerous
14  complaints joined retailers as parties, and the release in this
15  case would absolve them.  They would be considered released
16  parties.  But that's one of the prices that when you're
17  negotiating a settlement that you literally must consider to
18  purchase peace.  And in order to bring closure to this case in
19  a res judicata effect when the notice goes out and the class
20  responds, and to bring this matter to a conclusion, that was
21  one of the issues that we negotiated.  It's not as if, your
22  Honor, that if the defendants said we're not going to do it,
23  plaintiffs' counsel said okay.  Far from it.  We fought long
24  and hard with these defendants and their counsel to get where
25  we were at today.

13

746zmdlm

 1          But in the end, sending out subpoenas to third parties
 2    was just something that we feel is unreasonable, it would be
 3    overly burdensome, and it would create probably chaos in the
 4    courtroom considering that maybe all of these retailers will
 5    then have counsel coming in here and objecting, probably for
 6    some of the very same reasons that I'm now advocating to the
 7    Court.
 8          So, publication, as in the cases Agent Orange that we
 9    cited and Compact Disk in our reply brief, and that type of
10    notice and the Malane, that even though it may be possible that
11    you could have some type of a direct notice, in the whole
12    sphere of things, publication, as those cases indicated, was
13    the way to go, and they did not require notice.  And I suspect
14    that the number of people with agent orange, for example, were
15    more than the number of potential class members in this case.
16          Additionally, your Honor, I would like to note that
17    with respect to the settlement, I want to go back, that there's
18    a disclaimer that will be in the books that states, not all
19    portions of the book are factually accurate, which will now be
20    in the Random House books, as well as a publisher and author's
21    note which is already in there in the books.
22          We've provided for claim forms.  They can download it,
23    they can call into an 800 number.
24          I've discussed the bases why the Court, we believe,
25    should approve it.  And really the criteria at this stage is,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

746zmdlm

1  of the proceeding is is it within the range of fairness and
2  reasonableness. We believe that it is. And, again, we weighed
3  the factors, we weighed the risk, appeals, litigation, et
4  cetera, and this is what we're advocating.
5          Lastly, your Honor, class certification. Why should
6  this class be certified. The elements of numerosity
7  commonality, typicality, adequacy of representation,
8  superiority, manageability, and that this is the best vehicle
9  with which to proceed with this case I believe are all here. I
10 don't think numerosity is a dispute.
11         THE COURT: I don't think anyone, at least for
12 settlement purposes, contests the fact that this should be a
13 class action.
14         MR. DRURY: All right. Then the only other matter
15 that I have, Judge, is this, and your preference of course will
16 prevail. I can respond, and I have, in part, to the comments
17 and objections, if you will, by Mr. Bonnor and his client, or
18 preferably I could wait to hear what he has to say and then I
19 would like the opportunity to reply, if that suits the Court.
20         THE COURT: All right. Thank you, Mr. Drury. I think
21 I'll first hear from the other supporters of the settlement,
22 the defendants to see if there's anything they wish to air now.
23         MR. DRURY: Excuse me, your Honor. I'm sorry. I
24 would like to present --
25         THE COURT: Yes.

746zmdlm
```
 1             MR. DRURY:  -- to the court, if you approve the --
 2    preliminarily approve the settlement, suggested dates for
 3    claims, exclusions, opt outs.  There's the notices are also
 4    attached, as well as an order of preliminary approval.
 5             THE COURT:  Thank you.
 6             MR. DRURY:  Thank you.  Amended notice.  I'm sorry.
 7             THE COURT:  Thank you.
 8             Do defendants wish to add anything to the comments of
 9    Mr. Drury?
10             MR. BLOCKER:  Judge, we don't wish to add anything.  I
11    would just point out one thing.  The motion for preliminary
12    approval is actually brought by the plaintiffs.  We have
13    actually taken no position with respect to preliminary
14    approval.  We're leaving that totally up to your Honor.
15             With respect to your question about how many
16    purchasers would get direct mail notice, it would be a small
17    fraction of the class, but that's because those are all the
18    addresses that we really have.
19             THE COURT:  Yes, I understand.
20             All right, Mr. Bonnor, would you like to address the
21    motion?
22             MR. BONNOR:  I would, your Honor.  Thank you very
23    much.  As I said, my name is Jim Bonnor.  I'm with Shalov Stone
24    Bonnor & Rocco.  We represent plaintiff Sarah Rubenstein.  With
25    my co-counsel Kalcheim firm.
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>
(212) 805-0300

16

746zmdlm

```
 1           My firm's here today and our client in order to
 2   protect the interests of the millions of class members that Mr.
 3   Drury has described, who will not receive any practical notice
 4   at all of the settlement.
 5           THE COURT:  Let me ask you whether you're objecting or
 6   your client's objecting to the amount of the settlement.  I
 7   didn't really see that in the papers, but I wanted to confirm
 8   or to make explicit your client's views on the adequacy of the
 9   settlement, leaving aside notice issues.
10           MR. BONNOR:  I think, your Honor, if you were to
11   approve the notice campaign in the shape that it's currently
12   in, settlement would be an adequate settlement because no one
13   is going to respond to the notice.
14           However, if we undertake an adequate notice campaign,
15   we're going to get many many class members to respond to that
16   notice and there are going to be a large number of claims.
17   They're providing for a hundred percent recovery, as Mr. Drury
18   said, on behalf of the class members, and in that circumstance
19   if you were to adopt the notice campaign, which I'll advocate
20   here today, your Honor, I think that the settlement would be
21   inadequate under those circumstances.
22           THE COURT:  All right.  Proceed.
23           MR. BONNOR:  There are two guiding principles of
24   course as to what constitutes adequate notice in class action.
25   There's Rule 23(c)(2), which says that you're supposed to give
```

746zmdlm

1  adequate notice what's reasonable under the circumstances.  And
2  what's reasonable under the circumstances means personal notice
3  to everybody who can be identified with reasonable efforts,
4  your Honor.  That's the exact words of the rule.
5          And in addition to that, the Supreme Court has told us
6  over and over again in Eisen and Schuts and other cases that it
7  is a constitutional right of the class members to be informed
8  personally of the terms of a settlement and their right to make
9  a claim in a settlement in the event that they can be
10 identified.
11         And the MLP group would have you think, your Honor,
12 that there was no way for them to identify who the members of
13 the class are, other than the 1,000 or less class members who
14 purchased their book directly from Random House.  But that's
15 obviously incorrect, your Honor.  That is absolutely untrue.
16 You've already pointed out today that there are parties in this
17 litigation, parties in this litigation who undoubtedly maintain
18 lists of their customers.
19         THE COURT:  They're not parties to the settlement
20 agreement.
21         MR. BONNOR:  I'm not sure why they're not parties to
22 the settlement agreement, your Honor, but --
23         THE COURT:  Well, they're not parties to the
24 settlement agreement, I think it's fair to conclude, because
25 they don't believe they have even sufficient exposure to

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

18

746zmdlm

```
 1   plaintiffs' claims to warrant their signing a settlement
 2   agreement.
 3           MR. BONNOR:  But that's all well and good, your Honor.
 4   They don't to have contribute to the settlement.  The issue is
 5   whether it is easily available to the parties in the litigation
 6   so the plaintiffs in this litigation, and for your Honor to
 7   order the parties in this litigation to provide the notice that
 8   is mandatory, mandatory under Rule 23 and a constitutional
 9   right under the Supreme Court.
10           THE COURT:  Well it begs the question.  What's
11   mandatory is what's reasonable.
12           MR. BONNOR:  What's reasonable, your Honor.  It's --
13   the rule says what's reasonable, but the rule also, your Honor,
14   explicitly says that what's reasonable is personal notice, not
15   publication notice, personal notice to every class member who
16   can be identified with reasonable efforts.
17           Now what reasonable effort would be required to turn
18   to Barnes & Noble or to Anchor Books, who are defendants in
19   this litigation, and to say here, you're going to do the same
20   thing that the people at Random House are going to do, you're
21   going to provide notice to those people who bought directly
22   from you.
23           THE COURT:  And who is going to pay Random House to do
24   this -- I mean, Barnes & Noble, rather?
25           MR. BONNOR:  Well, your Honor, my guess is that it
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

746zmdlm

 1   would cost very little money to -- as a starting point.  But
 2   we're stuck with the terms of their settlement.  Under my
 3   world, the way things are usually done in consumer class
 4   actions is the defendants pay for this notice.  That's
 5   typically what happens.  In fact, I can't remember any
 6   settlement -- and I've been doing this for 15 years now, in a
 7   consumer case where the defendants didn't pay for notice, and
 8   where the costs of that notice --
 9           THE COURT:  Let's assume that the Court concludes that
10   the settlement amount of 2.35 million is very beneficial to the
11   class members, given the risks that the claims might be
12   dismissed on a motion to dismiss or the class might not be
13   certified due to individual issues of reliance.  Assume I reach
14   that conclusion, then the question becomes if there's $2.35
15   million in a pot, how much money do you believe should be spent
16   on notice in this case?
17           MR. BONNOR:  First of all, your Honor, I don't know
18   exactly how much would be required to provide notice.  My guess
19   is it would be very little.  Because most of these people have
20   e-mail addresses for their customers, and so we could do
21   something that's a little bit innovative in this case where the
22   settlement amount that you're talking about is relatively
23   small, and we could provide people with personal notice by
24   e-mail.  It's a perfectly legitimate form of providing people
25   with notice.  You could direct them to the website that Mr.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

746zmdlm

1   Drury has spoken about today, and for a very minimal amount of
2   money, we could identify hundreds of thousands, if not millions
3   of class members who purchased this book and have a right to
4   make a claim in this settlement.  So that's a very small amount
5   of money, your Honor.  In addition to that --
6         THE COURT:  Now, are you talking about a campaign that
7   would require retailers who are not even parties to this
8   litigation to join this program?
9         MR. BONNOR:  Yes, your Honor.  And --
10        THE COURT:  And how would you do that?
11        MR. BONNOR:  Well, there are two ways.  We could do it
12  voluntarily, which often happens in class actions -- and I'll
13  go through some cases that talk about that if you like, your
14  Honor.  In addition, we could easily subpoena these customer
15  lists.  We could simply get, for example, from Amazon.com, it's
16  one of the most sophisticated retailers in the universe, they
17  have all of these people's e-mails.
18        THE COURT:  So you don't think there are any First
19  Amendment concerns in subpoenaing Amazon.com's customer lists
20  for a particular publication?
21        MR. BONNOR:  No, I don't, your Honor.  I don't think
22  that there is a legitimate First Amendment concern.  In fact,
23  if you were to read the Tattered Cover case, which is the case
24  that the defendants relied upon most heavily in advancing this
25  argument -- which I would note was not mentioned at all in the

746zmdlm

1   papers that were supplied in support of the settlement, didn't
2   come up until after we had raised this issue -- but in any
3   event, in the Tattered Cover case the Court explicitly decided
4   that it had to turn to Colorado law in order to find that there
5   was some protection for the list of purchasers or the
6   individual who purchased the book that was at issue in Tattered
7   Cover, because the Tattered Cover case points us to a number of
8   Supreme Court cases which have said, essentially, that First
9   Amendment rights of the various individuals have to give way in
10  appropriate circumstances to other legitimate interest that
11  litigants may have.  And I would point out, your Honor, that
12  there are --
13          THE COURT:  And so here you're weighing the rights to
14  privacy, if you will, and the rights to, I suppose, to read
15  what you like without advertising it, against the adequacy of
16  notice.  Those are the two considerations you're weighing here,
17  right?
18          MR. BONNOR:  That's exactly right, your Honor.  Those
19  are the two considerations.
20          And what the Tattered Cover case told us is Supreme
21  Court precedent dictates that in these circumstances -- in the
22  circumstances at issue in that case where they were looking to
23  find out why a certain person read the content of that book,
24  that even in those circumstances where the issue was the
25  content of the readers, the book that they read, the Court said

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

746zmdlm
1   that the First Amendment would not, in all likelihood, provide
2   any protections in those circumstances.  The Court had to turn
3   to Colorado law.  And interestingly again, your Honor, in the
4   Tattered Cover case, what the Court said, again applying
5   Colorado law, was that in circumstances where we were searching
6   for a book purchaser, in circumstances where we're not really
7   interested in what the subject matter of the book is, we're
8   just interested in the identity of the person who purchased
9   that book, that in those circumstances, even under Colorado law
10  there would be very very low interest in protecting the
11  identity of that individual; that the First Amendment or the
12  privacy issues that were raised in those circumstances where
13  we're searching for the identity of a person, not the contents
14  of the book that they read, it would not be a protected
15  interest.
16          And what has the Supreme Court said about this issue?
17  There have been many cases in the Supreme Court balancing First
18  Amendment rights against the rights of litigants.
19  Interestingly, your Honor, there's certainly no case in which a
20  constitutional right, a constitutional right to due process by
21  class members, and when Congress and the Supreme Court have
22  dictated people are entitled to individual notice, no case
23  decided that in those circumstances that a First Amendment
24  right to remain private --
25          THE COURT:  You seem to be premising your argument on
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

746zmdlm

1   the assumption that individual notice is the only way, only
2   constitutional way to provide notice of a class action.  That's
3   just not the case.
4          MR. BONNOR:  But it is the case, your Honor.  In
5   circumstances where, with reasonable effort you can identify
6   the class members, Rule 23(c)(2) says absolutely, positively,
7   unequivocally that if you can identify those class members you
8   are mandatory, you have to provide them with personal notice.
9   And the Supreme Court has told us in Eisen, they've told us in
10   Schuts, that that is a due process right, it is a
11   constitutional right of the class members.  If they can be
12   identified through reasonable efforts, they are entitled to
13   personal notice in those circumstances.
14          THE COURT:  All right.
15          MR. BONNOR:  Now, the Supreme Court -- getting back to
16   the First Amendment issue -- there's a Zercher versus Stanford
17   Daily News I believe is the case.  That's a case that's
18   mentioned in the Tattered Cover case.  There the Supreme Court
19   said that when you have a search warrant, we can force a
20   journalist to provide photographic evidence that was not
21   published publicly.  That's a very important First Amendment
22   right, the right of freedom of the press.  And the Court said
23   in those circumstances, the right of the government to find out
24   the individuals who perpetrated certain violence at a
25   demonstration, outweighs the First Amendment right.  There is

24

746zmdlm
1  another case called Branzburg versus Hayes, it's a venerable
2  old First Amendment case.  And in that case the Supreme Court
3  said, we have a circumstance where we have journalists with
4  confidential sources who have not been made public, and the
5  Supreme Court says in that circumstance the government is
6  entitled to find out the identities of those confidential
7  sources.
8          THE COURT:  And what was the reason that this was
9  disclosed?
10          MR. BONNOR:  The reason why --
11          THE COURT:  Countervailing reason.
12          MR. BONNOR:  The Court said in those circumstances
13  that the Government's interest --
14          THE COURT:  What was the Government's interest?
15          MR. BONNOR:  It's in prosecuting these individuals.
16          THE COURT:  Yes, I mean that's a little different than
17  the situation we have here.  Don't you think that a
18  hypothetical class member in a situation in which he's
19  purchased, say, a quite controversial book, either of a
20  political nature or perhaps a moral nature, would be hesitant
21  to have his purchase made public for the purpose of protecting
22  his right to get a notice that he might have a claim against
23  the publisher?
24          MR. BONNOR:  There is no doubt, your Honor, that there
25  may well be circumstances in which a class member might prefer

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

746zmdlm

```
 1    not to have his or her name disclosed in those circumstances.
 2    This is not, however, one of those circumstances, and --
 3         THE COURT:  Well it may be.  People may be quite
 4    sensitive about whether they're drug users, whether they've
 5    been in rehabilitation, whether they're reading this book for
 6    those types of reasons.
 7         MR. BONNOR:  This is the runaway best seller of 2004,
 8    2005, your Honor.  I believe it was the second --
 9         THE COURT:  It's a good book?
10         MR. BONNOR:  Well, I don't think it was a good book.
11    But behind one of the Harry Potter books, the most highly sold
12    book of 2004, 2005.  There really is no negative connotation
13    that comes along with being one of the masses I believe, your
14    Honor.
15         THE COURT:  Okay.
16         MR. BONNOR:  So when we have a weighing test, I think
17    your Honor points out a good point.  If you take the Tattered
18    Cover case, for example, your Honor, there they were looking
19    for someone who had purchased the book about making
20    methamphetamines.  Now certainly if you're the, you're the
21    defendant in that circumstance, that's a private matter.  You
22    don't want anyone to know that you're out purchasing books
23    about making methamphetamines.
24         This is not that circumstance, your Honor.  The courts
25    have weighed the interest in those circumstances and they've
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

746zmdlm

1  come out consistently, consistently in favor of disclosure.
2  And I'll point out --
3          THE COURT:  I understand your argument.  I would point
4  out you're weighing, on one hand here, the adequacy of notice
5  of a class settlement as opposed to many of these cases we're
6  talking about state's rights to prosecute wrongdoing.
7          MR. BONNOR:  And --
8          THE COURT:  It's a little bit different.
9          MR. BONNOR:  What I would point out in that
10 circumstance is there are many many circumstances in which the
11 state's right or the Government's right to prosecute
12 individuals has to give away to constitutional rights.
13         THE COURT:  I understand.
14         MR. BONNOR:  We have Fourth Amendment rights, and the
15 courts have said over and over again we can't violate Fourth
16 Amendment rights in order to prosecute people.
17         We have Seventh Amendment rights, and the courts have
18 said, of course we can't violate those rights in order to
19 prosecute people.
20         Here, your Honor, we have a constitutional right.  We
21 have a Fifth Amendment right to due process we have a
22 Fourteenth Amendment right to due process.  And the Supreme
23 Court has told us that what those constitutional rights mean is
24 that class members are entitled to individual notice.
25         So I think that in doing the weighing that we're

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

746zmdlm
1  talking about here, the very minimal, minimal imposition that
2  we have on First Amendment rights here, where we have a best
3  seller, the most highly sold book in 2000 -- second most highly
4  in 2004, 2005, the very minimal imposition on First Amendment
5  rights.  And, your Honor, what I would say also is --
6          THE COURT:  Why don't you -- I think I understand your
7  First Amendment argument.  Why don't you address any other
8  objections you have to the settlement.
9          MR. BONNOR:  If I could just very briefly on the First
10  Amendment point, your Honor.  I don't mean to take up your
11  time, but just very briefly.  I'd like to say Random House is
12  sending individual notice to the people who purchased from
13  them.
14          THE COURT:  Yes, they voluntarily agreed to do that as
15  a party to the settlement.  That's a little bit different from
16  requiring non parties to the settlement to either divulge their
17  customer lists with respect to specific books that have been
18  purchased, or in some manner to require them to distribute a
19  notice.
20          MR. BONNOR:  The --
21          THE COURT:  So I think I understand your First
22  Amendment issue.  Let's move to the other ones.
23          MR. BONNOR:  The First Amendment right in those
24  circumstances belongs to the customer, your Honor.  It doesn't
25  belong to Random House.  The issue is they're willing to --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

28

746zmdlm

```
 1              THE COURT:  Yes, that's --
 2              MR. BONNOR:  -- send out notice to their customers.
 3    The customers are in the very same position, vis-a-vis
 4    Amazon.com.
 5              THE COURT:  Yes, of course Random House isn't
 6    divulging anything to anybody else by sending a notice to their
 7    customers.  That wouldn't be the case if you took the little
 8    shop around the corner and said give me your customer list
 9    because we're going to send a notice to your customers.
10              MR. BONNOR:  And in those circumstances, your Honor,
11    what courts generally do; for example, there was a recent case
12    here against Jenkens & Gilchrist.  It arises out of the KPMG
13    tax frauds.  And what the court did in that circumstance is it
14    required the defendants in that case to send out notice to the
15    customers.  And what your Honor is certainly empowered here to
16    do and what is done in every single securities class action,
17    hundreds every year, thousands in the course of history, is you
18    require the people who are in possession of these customer
19    lists to send out notice.  And you could look at the web site
20    of any claims administrator and you're going to find hundreds,
21    hundreds of cases in which people are being required to send
22    out notice, if they want to keep confidential their customer
23    lists, which is certainly a legitimate reason for them to do
24    that, but that does not interfere, your Honor, with your
25    ability to require them to do it, or an absolute minimum, at a
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

746zmdlm
1   absolute minimum, the champions of the class should undertake
2   some effort to try to get those people to send out notice to
3   the class.
4           THE COURT:  All right.  Thank you for addressing First
5   Amendment issues.  Let's move on to the other ones.
6           MR. BONNOR:  The other issue, your Honor, is this
7   question about whether we can require third parties or somehow
8   or other ask third parties to participate in the notice
9   campaign.  And the most recent case that I could find, the best
10  example of this, your Honor, is Judge Gleeson's decision in the
11  Visa check, Master money litigation.  You probably remember
12  that case.  It was brought by Walmart, it was an antitrust
13  case.  They were alleging that there was certain price fixing.
14  And what Judge Gleeson required in those circumstances was for
15  the plaintiffs to go out and subpoena records from 81, 81
16  different entities that issued Visa cards or Master cards to
17  retailers.  The Court required the plaintiffs to do that in
18  order to provide notice to the class members.  And what the
19  court also said is, the defendants will send a letter to every
20  one of those 81 entities and they will ask them for their
21  cooperation in providing notice to the members of the class.
22  And in addition, what the court said was reasonable in those
23  circumstances was for the plaintiffs to fight up to 20 motions
24  to compel --
25          THE COURT:  I'm sorry, is this the same point or is
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

746zmdlm

1   this a different point?
2         MR. BONNOR:  This is the point, your Honor -- they say
3   you can't possibly ask third parties to provide any information
4   that will assist us in providing notice to the class.  And what
5   I'm saying is in that case the Court required them to --
6         THE COURT:  I understand that there is nothing
7   prohibitive in writing a letter to somebody asking them to do
8   something.  That act, in itself, is not prohibited.
9         MR. BONNOR:  No, your Honor.  I'm not saying that the
10  Court -- the Court didn't ask anyone to write letters.  What
11  the Court asked or required -- ordered the plaintiffs to do in
12  the Visa Master money case was to subpoena records from 81
13  different entities, required the defendants to write --
14        THE COURT:  Yes, the issue to me isn't whether or not
15  it's a burden to issue 81 subpoenas.  The question is whether
16  or not it's appropriate in this case given the First Amendment
17  issues that have been raised.
18        MR. BONNOR:  I think they're are two separate issues,
19  your Honor.  The first issue is whether it's practical under
20  the circumstances to identify class members.  And it certainly
21  is practical to identify class members.  We know that there are
22  entities out there with long lists.
23        THE COURT:  All right, I think --
24        MR. BONNOR:  The second --
25        THE COURT:  I think we've established -- you've

31

746zmdlm
1  established all your points as helpful as you can.  So I think
2  we're simply going at it from a different angle.  If there's
3  some other issues that you want to address, please do.
4          MR. BONNOR:  What I would like to do -- if your Honor
5  wants to hear, I would like to do this, but if your Honor is
6  sick of hearing from me I'll certainly sit down at this point
7  in time.  They cite a number of cases where they said --
8          THE COURT:  No.  What I simply don't want you to do is
9  repeat yourself.
10         MR. BONNOR:  They cited a number of cases, your Honor,
11 the plaintiffs, where they said that courts decided that it was
12 impracticable to provide notice to the class members.  And I
13 would say, your Honor, that if we were to read those cases,
14 that every one of them suggests, in circumstances which are
15 similar to the ones that we have at issue here, that the
16 plaintiff should be required to go out beyond the limited means
17 that they have available to them at this point in time and to
18 look outside for other sources of lists of class members in
19 order to provide notice to the members of the class.
20         Mr. Drury cited the Agent Orange case.  In that case
21 it was impossible to identify every one who had been in Vietnam
22 and exposed to Agent Orange.  We did not  know where agent
23 orange had been dropped, we didn't know who had been exposed
24 to.  What the court required in those circumstances was to send
25 out notice, your Honor, to hundreds of thousands of class
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

32
746zmdlm
```
 1   members who had contacted the Veterans Administration and to
 2   provide them with notice.  It also required the litigants to go
 3   to the governors of every single state and to obtain from them
 4   a list of people who had contacted various state agencies
 5   regarding Agent Orange exposure and to provide those people
 6   with notice of the settlement in that litigation.  So Agent
 7   Orange, that's their case, suggests that precisely the opposite
 8   should be done of what's being done here.  They cite this the
 9   Lucas v. Kmart case.  I believe that's a case that Mr. Drury
10   cited, although I may be wrong about that.  That was a
11   circumstance in which a class action was brought on behalf of
12   people who were handicapped who utilized either wheel chairs or
13   scooters to get around Kmart.  In that circumstance it's
14   impossible to identify everyone in the United States who
15   utilizes a wheelchair or a scooter to get around Kmart.  What
16   the court required in that circumstance, and found reasonable,
17   was to go out and find a list of 200,000 people who had
18   registered with various marketing agencies as people who
19   utilized scooters or utilized wheelchairs and required notice
20   to be sent out to all of those people who could be found in
21   that list.  That was not a list that was in possession of the
22   parties.  It was a list that was in the possession of a third
23   party.  The Court found that was reasonable under the
24   circumstances.  Another case that they cite, their very own
25   case, your Honor, the Sarasone Products case is a case that
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

746zmdlm

1  deals with a drug damages, injuries resulting from exposure to
2  a drug.  And what the court did in that circumstance is, we
3  can't determine who it was, every single doctor in America who
4  prescribed this drug to people, but there is a list that's
5  maintained by the government, which is negative occurrences
6  reports.  We're going to require notice to be sent out to every
7  single person who is on that list.  And, in addition, the
8  defendants in that case had been contacted by thousands of
9  doctors who say that their clients have been injured.  We're
10  going to require notice to be sent to every one of those
11  doctors and to require or to request in those circumstances
12  that those doctors identify their clients and send them notice
13  of this class action.
14          So there are many many cases, your Honor, many cases
15  where we're reaching beyond what's available to the parties
16  without doing any discovery and without undertaking any effort
17  whatsoever and requiring them to send notice to the class.
18          And one last thing on notice that I'd like to say,
19  your Honor.  They're advocating that they published notice in
20  these publications.  It's U.S.A. Weekend and Parade Magazine.
21  And we have a whole room full of people who are involved in
22  prosecuting class actions.  And this weekend there was one
23  notice published in Parade Magazine.  Now, does anyone know
24  what that notice was?  No.  No one knows what that notice is
25  because no one's going to read this notice, your Honor.  It had

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

746zmdlm

1    to do with seratin, the drug seratin.  There is a notice that's
2    set forth right in the middle of this document.  It's right
3    next to all the Great All Americans, which was why I was
4    interested in it.  You know, I was hoping somebody was going to
5    Rutgers, but no one is.  But the point is, your Honor, that the
6    notice that they're proposing in this circumstance is not going
7    to reach anyone.  No one is going to read it.
8            I've been involved in many many class actions.  Nobody
9    calls up my firm and says I read your notice in the Wall Street
10   Journal today, I read your notice here or there.  Those notices
11   are published for due process purposes.  It's necessary --
12           THE COURT:  You think they're a waste of time, I take
13   it.
14           MR. BONNOR:  They're a waste of time and they're a
15   waste of money, your Honor.  There are much much more effective
16   ways to reach the members of the class in this litigation.  And
17   if the parties had undertaken any effort whatsoever to identify
18   those class members, they could have done it economically and
19   they could have done it much more efficiently.
20           I would point out, your Honor, just the last thing I
21   like to say on this issue is we're dealing with retailers who
22   really could be served well by providing notice to their
23   customers.
24           THE COURT:  How many book retailers are there in the
25   country?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

35

746zmdlm
```
1          MR. BONNOR:  This is a very concentrated industry,
2    your Honor.  What's reasonable under the circumstances, you've
3    pointed that out, we have, as my little bit of research on
4    this -- the publishers might be able to put some more insight
5    into it -- my researchers indicated Barnes & Noble has a
6    15 percent market share, Borders has about a 14 percent market
7    share, and so we're dealing with a very -- Walmart is a huge
8    book seller, Amazon.com obviously is a huge book seller, just
9    those three, four, five we could probably identify 50 percent
10   of the members.
11         THE COURT:  Would that be sufficient in your view?
12         MR. BONNOR:  Your Honor, I don't think it is practical
13   in this circumstance to go out and subpoena records from every
14   corner book store.  That's not possible.  But we're dealing
15   with something that will be infectious.  When you get out on
16   the internet this notice and you provide people with e-mails
17   and it says you can get $25 back for buying A Million Little
18   Pieces, they're going to send it to their friends who they know
19   read it and this notice is going to be spread throughout the
20   world, and a lot of class members are going to become aware of
21   it, certainly a lot more than that are going to read it in
22   U.S.A. Weekend.  No one is going to read this notice, your
23   Honor.  And so as a result of that we have constitutional
24   concerns, we have the unequivocal words of Rule 23(c)(2), we
25   have the Supreme Court saying that people are entitled to
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

746zmdlm

1     individual notice.  And I cited to you all these various First
2     Amendment issues.  I won't go back and repeat that.
3          And the last thing I would like to say deals with the
4     preliminary approval.  Of course your Honor knows that Rule
5     23(g) requires you in a circumstance where you're going to
6     grant approval or certification to a class that you have to
7     choose counsel for the class, and I think you've put off that
8     issue.  Previously you made Mr. Mullaney interim lead counsel.
9     We pointed out in our papers that the --
10         THE COURT:  No, I appointed him liaison counsel.  I
11    haven't ruled on the class counsel issue.
12         MR. BONNOR:  We've pointed out in our papers, your
13    Honor, that the papers that were submitted by the plaintiffs in
14    this litigation were filled, every single paragraph, with typos
15    and mistakes.  It was something that at my firm would never
16    ever leave the door.  I can assure you under absolutely no
17    circumstances would those papers leave the door.
18         And we've also submitted to you, your Honor, our firm
19    resumes.  It explains to you the various experience that we
20    have.  It is a great deal more experience than these gentlemen
21    have here.  And just last week we've obtained a settlement in
22    Massachusetts, $60 million in a securities class action before
23    Judge Saras up there.  It's an unusual issue dealing with
24    liability on, under 10(b)(5)(a) and (c), something that's now
25    before the Supreme Court on certiorari.  Just two weeks ago in

746zmdlm
1 Judge Daniels' courtroom we received approval of a $20 million
2 settlement in the Winstar Securities litigation. And again,
3 your Honor, that's just something that's happened since we
4 submitted our papers. There's a long list of successful cases
5 that we've prosecuted that are set forth in our papers. I
6 won't go through all of those things.
7        But what I would like to close by saying is the class
8 deserves to have a champion in this case who is going to look
9 out to protect their rights. That has not been done thus far.
10 There are hundreds of thousands, if not millions of class
11 members who will receive no notice if what is being proposed by
12 the MLP group occurs, and I think your Honor should take that
13 into consideration in appointing lead counsel and in deciding
14 whether to preliminarily approve this litigation. Thank you
15 very much, your Honor.
16        THE COURT: Thank you, Mr. Bonnor.
17        Mr. Drury, would you care to respond?
18        MR. DRURY: Yes, your Honor. Thank you, your Honor.
19 I will be brief.
20        Rule 23 is quite clear. That provides for the best
21 notice practicable. We believe that our notice that we've
22 recommended meets constitutional muster; publication is the way
23 to go, the direct mail and the internet. Simply put --
24        THE COURT: Why would it be difficult for class
25 plaintiffs to provide a form of notice to the major retailers
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

38

746zmdlm
1  and ask them to distribute it to the customers, their customers
2  whom they're aware of purchased this book?
3          MR. DRURY:  Well, first, your Honor, I believe it's an
4  undue burden.  It's not one that the plaintiffs with defendants
5  couldn't do, but I think it would be unreasonable, as I
6  suggested before, and burdensome to go to third parties that
7  are not even parties.
8          THE COURT:  I'm not talking about issuing subpoenas
9  and getting involved in tangential litigation over subpoena
10 enforcements.  I'm simply saying contacting Barnes & Noble or
11 Borders and requesting them, not to hand over your list, but
12 simply to e-mail to their customers a copy of the notice.
13         MR. DRURY:  Because I think that is doing indirectly
14 what we say can't be done directly, and we get back to the
15 constitutional question of getting into First Amendment rights.
16 When people read books, when people get books they have the
17 right to receive it, take in the information, and do it being
18 anonymous.  Just questions --
19         THE COURT:  Yes, they're not anonymous vis-a-vis the
20 seller.  They're anonymous vis-a-vis the public, which is a
21 decent argument for not issuing subpoenas to require purchase
22 list to be turned over.
23         It's a different matter where you're asking the
24 publisher, on a voluntary basis, to, without any change in the
25 confidential relationship, if you will, if that's what one
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

39

746zmdlm
1    could call it, the anonymity, if you will, of the purchaser of
2    having that seller distribute the notice.
3            MR. DRURY:  Well first, your Honor, it's highly
4    unlikely, and defendant can address this better than I can,
5    that they are going to do that, unless so ordered by this Court
6    as part of this resolution.
7            As from the plaintiffs' perspective, I have never seen
8    it done where, in a case, in a consumer case such as this,
9    where you would go ahead and send a letter, let alone a
10   subpoena, to the parties that are not parties, the third
11   parties that are not even parties to the litigation itself.
12   Because when you send out a letter, whether it comes from the
13   plaintiffs or the defendants suggesting that they give us
14   information with respect to --
15           THE COURT:  That's why I'm not suggesting that you
16   write a letter to Barnes & Noble and ask them to give you
17   anything.
18           MR. DRURY:  Well, then what is the Court suggesting?
19   Maybe I --
20           THE COURT:  No.  I'm suggesting that -- I'm raising a
21   question as to whether it wouldn't be feasible simply to ask
22   Barnes & Noble to forward an e-mail or send an e-mail which
23   contains the class notice to any purchasers that it can readily
24   identify who purchased a book.
25           MR. DRURY:  At whose expense, your Honor?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

40

746zmdlm

```
 1              THE COURT:  Well --
 2              MR. DRURY:  Who is going to pay?  Let's say --
 3              THE COURT:  Well, you tell me, what is the expense?
 4              MR. DRURY:  Well, the expense for Barnes & Noble, for
 5    example, to e-mail the notice to all persons that they have on
 6    their list may, indeed, be considerable, and I believe that
 7    it's a --
 8              THE COURT:  What is it?  It may be, it may not be.
 9              MR. DRURY:  Well, it's labor intensive.  They have to
10    get it, they have to retrieve the information.  They have to
11    send it out.  They have to get it back.  They have to report to
12    counsel and to the Court.
13              THE COURT:  They certainly have their own customer
14    lists.
15              MR. DRURY:  They may, or they may have to create their
16    customer lists.  I don't know.
17              THE COURT:  I don't know either.
18              MR. DRURY:  I don't know that to be the fact.  But
19    what I do -- our position is that would be an undue burden and
20    unreasonable and unnecessary under the circumstances of this
21    case.
22              Now, I've heard a lot from Mr. Bonnor about his 15
23    years experience and all the cases he's had.  But it seems
24    interesting that in his research he only came up with one case
25    with respect to the subpoena.  He's come up with no cases that
```

746zmdlm

1  controvert that we have put forth to the Court the best notice
2  practicable under the circumstances.  And simply put, he wants
3  to be part of the case and get in on the settlement.  That's
4  the only reason he's here.  That's why he's here.  All his
5  cases that he talks about -- I have 37 years of experience.
6  I've tried criminal cases, federal cases, criminal and state.
7  I've argued 47 appeals.
8          THE COURT:  I don't think I need to hear about the
9  competence of counsel.
10         MR. DRURY:  Well, I'm just saying that because he's
11  suggesting that he should be lead counsel based upon his
12  resume.  I think his resume falls flat, can't compare to mine
13  or Mr. Smith's.  I've been to the United States Supreme Court.
14  I doubt if he has.  But I'm not here to pat myself on the back.
15  I don't need to.  I believe my resume and my colleagues and
16  people who know me know what I've done and know what I can do.
17         But getting back to his argument, Judge, we believe
18  that the notice that's out there is the best notice practicable
19  under the circumstances.  It meets constitutional requirements.
20         The Malane case, Agent Orange and In Re: Compact Disk
21  all say that publication is fine.  I don't know where counsel
22  is coming from when he contends and argues that individual
23  notice is mandatory.  That's not the law, and that isn't the
24  case.
25         But what I would ask is that your Honor preliminarily
               SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

746zmdlm

1   approve this settle, approve the notice package, if you will,
2   that we presented to the Court, and appoint myself and Mr.
3   Smith as co-lead counsel, Mr. Mullaney, who is already liaison
4   counsel.  And should your Honor decide that at this juncture,
5   for whatever reason -- and I hope this isn't the case -- you're
6   not going to approve the settlement as presented, I would also
7   ask that at this time that in the interim, because it's been
8   six months since we initially asked to be appointed interim
9   counsel, that Mr. Smith and myself, indeed, be appointed
10  interim counsel.  Thank you.
11          THE COURT:  All right.  Does defendant wish to address
12  any aspect of the notice argument?
13          MR. BLOCKER:  Yes, your Honor.  Can I address three
14  small points, your Honor.
15          First of all, your Honor asked what is the number of
16  book retailers.  I don't actually know the exact number, but
17  let me tell you how you can estimate it, your Honor.  We turned
18  over a printout to the plaintiffs that is a list of all of our
19  sales of the book by publisher or by retailer, and the list is
20  67 pages long, and I think there are about 50 or 60 entries on
21  every page.  So order of magnitude that will give you an idea
22  there are a large number of book retailers throughout the
23  country that we deal with.
24          Second, I want to address Mr. Stone's point that
25  nobody reads the publication notices.  First of all, Judge, I

43

746zmdlm

1   don't think that's true at all.  I've been involved in a number
2   of settlements where publication notice was the only means of
3   communicating with the class, and those generated a large
4   number of responses.
5           And, second, even if we were to take Mr. Stone or
6   Mr. Bonnor's point, you know, point blank and assume that
7   nobody reads them, this case is different.  Because
8   unfortunately for Random House, this case gets a lot of free
9   publicity.  The events surrounding the publication and the
10  marketing of A Million Little Pieces have been very much in the
11  press.  There was an article published on the internet only a
12  few weeks ago.  And once the publication notice hits the U.S.A.
13  Today and Parade, items that in which they're going to be
14  published, you can be sure that even if they are not read by
15  tons of class members -- and I'm sure they will be anyway --
16  that there's going to be a lot of free publicity pointing out
17  that there is a settlement, people can get cash.  And in
18  designing the notice program, your Honor, that was specifically
19  taken into account.
20          One thing the plaintiffs have already pointed out is
21  as part of designing notice program, neither the defendants nor
22  the plaintiffs did this on their own.  We got together, we
23  engaged Rouse Consulting, who is an expert at doing these sort
24  of programs.  They got another entity involved called Concella
25  Communications, whose whole mission is to design effective

44
746zmdlm
```
 1  publication notice programs.  We spent a lot of time with
 2  Concella trying to make sure that whatever publication notice
 3  program was put in place was reasonably calculated to reach
 4  the -- a large percentage of the class.  And so this wasn't
 5  done on our own, and I'm not standing up and pretending to be
 6  an expert on it.  But I can assure you the parties did go to
 7  somebody we do deem to be an expert and try and do the best job
 8  that we possibly could.
 9          And the last point, your Honor, is I don't want to
10  belabor the First Amendment issue.  If your Honor has any
11  questions, I'm happy to address them.  It's an issue that --
12          THE COURT:  Well, I don't see a First Amendment issue
13  in the hypothetical category of Barnes & Noble agreeing to
14  distribute the notice to its own customers.
15          MR. BLOCKER:  Well, I guess -- I agree with you.
16          THE COURT:  I don't know whether that's feasible or
17  practicable.  I'm not sure if there's a record on that, that
18  issue.  But I don't see a First Amendment issue here.
19          MR. BLOCKER:  Well, obviously, your Honor, if they
20  want to do so on their own, if they make a voluntary decision,
21  I guess they're making a First Amendment decision for their
22  customers.  My hunch would be, and the reason we filed the --
23          THE COURT:  They're not really disclosing anything
24  that they don't already know.
25          MR. BLOCKER:  No, but they're telling their customers.
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

45

746zmdlm

```
 1              THE COURT:  That they know.
 2              MR. BLOCKER:  Yes, that they do know.  So there is
 3      some of that.
 4              But I guess the one concern I have with the program
 5      you were describing with Mr. Drury is the following.  If the
 6      plaintiffs' counsel sends a letter to Barnes & Noble and says
 7      we'd like you to do this, that at least has some of the Court's
 8      imprimatur on it.  It might not be a subpoena.  It might not
 9      say at the top, subpoena, you must do the following.  But if
10      I'm Barnes & Noble, and I'm the in-house lawyer for Barnes and
11      Noble and get that, I'm going to have to make a decision, am I
12      going to be dragged into court if I don't do this, I'm --
13              THE COURT:  Well, they may want to do it.  They may
14      say this is a service to our customers.
15              MR. BLOCKER:  They may want to do it, that's possible,
16      your Honor.  But it puts them in a very difficult position
17      because if they don't do it, and it does carry -- when the
18      plaintiffs appointed by the Court ask Barnes & Noble to do
19      that, it carries the imprimatur, even if it's indirect, of the
20      Court and is, essentially, tantamount to the same sort of
21      subpoenas that we're concerned about.  And the reason we're
22      concerned about the issue, Judge, is it's not us today, but in
23      the next action down the road, you know, you setting a
24      precedent that this can or should be done, is something that
25      could come back in another class action that we are not a party
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

746zmdlm

1    of and somebody asking us to do exactly the same thing.  So we
2    do care a lot about it and I think there is sort of an indirect
3    imprimatur if you even have the plaintiffs' counsel ask the
4    Barnes & Noble of the world to send out --
5              THE COURT:  Well, there is a distinction between
6    Barnes & Noble, which is a party to the litigation, and the
7    retailer that's not a party to the litigation.
8              MR. BLOCKER:  It's -- there never was a consolidated
9    amended complaint filed, your Honor, because we reached a
10   settlement before that took place.  But I have no idea if they
11   would have been part of any consolidated amended complaint.
12   They certainly were named in some of the underlying cases that
13   were transferred to your Honor.
14             THE COURT:  Right.
15             MR. BLOCKER:  But --
16             THE COURT:  Somebody thought it was a good idea to put
17   them in --
18             MR. BLOCKER:  Yeah.
19             THE COURT:  -- in one release.
20             MR. BLOCKER:  But I think your Honor hit the nail on
21   the head.  I mean, I think these entities perceive they have
22   absolutely no exposure or at least none that they couldn't lay
23   off on the publisher.  And so, you know, that's why we want
24   them out, but they don't really -- they are not parties in the
25   true sense.  They're not currently named in any consolidated

47

746zmdlm
```
 1    amended complaint.  And at the end of the day, I'm not sure
 2    that makes any difference because they're not settling
 3    defendants, they're not settling parties.  They're not asking
 4    to be part of the settlement.  We just want them in there
 5    because we want to buy absolute peace at the end of the day.
 6              THE COURT:  All right.
 7              MR. BLOCKER:  I don't have anything else to add,
 8    unless your Honor has any other questions.
 9              THE COURT:  No.  I'll tell you, tell the parties where
10    the Court stands.
11              First of all, the Court appoints Mr. Drury and Mr.
12    Smith as co-lead counsel under Rule 23(g).  Based on their
13    prior experience and the work they've done in this case, I
14    think they are best able to represent the interests of the
15    class in this matter, and the Court, for much the same reason,
16    continues Mr. Mullaney as liaison counsel.
17              I think, having reviewed the papers and listening to
18    argument, there is no question in my mind that the amount of
19    the settlement is, on a preliminary basis, within the range of
20    fairness and reasonableness given the very significant legal
21    issues and mountains that the plaintiffs would have to climb to
22    succeed here, first on the class motion, and then on the
23    merits.  So I have no problem concluding that the amount of the
24    settlement is within a reasonable range.
25              I also believe that, contrary to Mr. Bonnor's
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

48

746zmdlm
1    suggestion, that notice can be an effective method of
2    publication, effective method of notice in many cases.
3         I have some hesitancy, however, as the parties may
4    have inferred from my questions, that the plaintiffs --
5    settling defendants and the plaintiffs have explored the
6    feasibility of expanding the notice program to request large
7    retailers, and I divide them into two categories:  Party
8    defendants, such as Barnes & Noble and non-party defendant,
9    probably worthy of separate analysis, but whether or not it's
10   feasible to request of them to distribute notice to their
11   customers.  I have no idea whether Barnes & Noble would be
12   willing to do this, what the cost would be and who would
13   shoulder the cost.  Those are all relevant factors.  As I say,
14   they probably cut differently for parties and non-party
15   retailers, and so I'm not going to rule on the motion for
16   approval of the settlement at this juncture.
17        The class certainly is an appropriate settling class,
18   but I'm going to simply defer, until I receive supplemental
19   submissions by the parties, on the feasibility of retailer
20   participation and notice.  I think it's a given that all
21   parties want broad notice that's feasible, and so there really
22   aren't conflicting goals among the parties here, including the
23   party represented by Mr. Bonnor.
24        How much time does counsel want to make a supplemental
25   submission to the Court on this issue?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

49

746zmdlm

```
 1          MR. DRURY:  Your Honor, the plaintiffs -- I don't know
 2   if defendants -- 14, 21 days would be sufficient.
 3          THE COURT:  All right.
 4          MR. DRURY:  Either one, Judge.
 5          THE COURT:  All right, 21 days it'll be.  Which brings
 6   us to when, Mr. Donald?  Today is the 6th, is that right?  So
 7   April 27th.  And I suggest that the settling parties meet with
 8   Barnes & Noble and -- at a minimum, and see where things lie.
 9   I form no views as to where I'll come out on the notice issue
10   ultimately, and have no predisposition.
11          Anything further we should address this morning,
12   counsel?
13          MR. BONNOR:  Could I just briefly, your Honor, address
14   the issue of who should be contacted.  I think that, as I said,
15   it's a very concentrated industry.  You have Barnes & Noble at
16   approximately 15 percent, you have Borders at approximately
17   14 percent.  I don't know what Amazon.com's percentage is, but
18   it's got to be fairly large, and Walmart's one of the biggest
19   book retailers, and I think at least with these four you could
20   probably cover 50 percent of the class here.  It wouldn't be
21   any more burden on these people to meet or to address this
22   issue with those four, and I think that would be very helpful
23   to the members of the class.
24          THE COURT:  All right, I'm not going to determine who
25   should contact whom.  I'm going to leave it up to the judgment
```

50

746zmdlm

1  of counsel for the settling parties to take a reasonable
2  approach to preparing a response to the Court's inquiry.
3          MR. MEYER:  Judge, just so I'm clear in my mind, we'll
4  have a hearing on the 27th?
5          THE COURT:  No.  I'm asking for a written submission
6  by the 27th, and then I'll advise the parties after reviewing
7  their submissions what the appropriate next step will be.
8          MR. MEYER:  Thank you.
9          MR. DRURY:  Your Honor, one more point.  I didn't hear
10  your Honor mention who the class representatives would be.  Mr.
11  Smith and myself are class counsel.  Do we need to -- does your
12  Honor wish to address that question now who the class -- all
13  the named plaintiffs or just the named plaintiffs for Mr. Smith
14  and myself.
15          THE COURT:  I don't think I need to resolve that.
16  Frankly, I assumed that the class representatives would be the
17  clients that the two of you represent.
18          MR. DRURY:  All right, thank you.
19          THE COURT:  Anything further, counsel?  All right,
20  we're adjourned.
21          THE DEPUTY CLERK:  All rise.
22          (Adjourned)
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300