## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE "A MILLION LITTLE PIECES" LITIGATION | No. 06-md-1771<br><br>Hon. Richard J. Holwell |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR FINAL APPROVAL OF SETTLEMENT.

Dated: September 24, 2007

LAW OFFICES OF THOMAS M. MULLANEY
Thomas M. Mullaney, Esquire
708 Third Avenue, Suite 2500
New York, NY  10017
Telephone:    (212) 223-0800
Facsimile:    (212) 661-9860

*Liaison Counsel for Class*

BRODSKY & SMITH, LLC
By: */s Evan J. Smith, Esquire (ES3254)*
Evan J. Smith, Esquire (ES3254)
240 Mineola Blvd.
Mineola, NY 11501
Telephone:    (516) 741-4977
Facsimile:    (516) 741-0626

*Co- Class Counsel*

Larry D. Drury, Esquire (admitted *pro hac vice*)
LARRY D. DRURY, LTD.
205 W. Randolph Street, Suite 1430
Chicago, IL 60606
Telephone:    (312) 346-7950
Facsimile:    (312) 346-5777

*Co-Class Counsel*

Dockets.Justia.com

<u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS…………………………………………………………………...ii

TABLE OF AUTHORITIES…………………………………………………………...…iv

I.  INTRODUCTION………………………………………………………………1

II.  BACKGROUND OF CASE AND SETTLEMENT……………………………..1

    A.  Factual and Procedural Background……………………………………..1

    B.  Settlement Background……………………………………………………2

    C.  Summary of the Settlement………………………………………………4

    D.  Preliminary Approval of the Settlement…………………………………5

    E.  Notice of the Settlement…………………………………………………7

    F.  Class Members' Responses to the Settlement…………………………...10

    G.  Objections and Opt-outs………………………………………...…..10

III.  THE SETTLEMENT MEETS THE CRITERIA NECESSARY FOR THIS
    COURT TO GRANT FINAL APPROVAL………………………………..…12

    A.  Standards Governing Approval…………………………………………12

    B.  Application of the *Grinnell* Factors Supports Approval of the
        Settlement…………………………………………………………..…13

        1.  The complexity, expense and likely duration of the litigation………13

        2.  The reaction of the class to the settlement……………………………13

        3.  The stage of proceedings and the amount of discovery
            completed…………………………………………………………..…14

        4.  The risks of the class prevailing…………………………………15

        5.  The ability of the defendants to withstand a greater judgment……...18

        6.  The range of reasonableness of the settlement fund in light of the
            best possible recovery and all the attendant risks of litigation………19

    C.  The Proposed Settlement Is Procedurally Fair……………………..…20

D.    **The Settlement Class Meets The Standards for Certification Under Rule 23**………………………………………………………………..**22**

    1.    **The numerosity requirement is satisfied**………………………**22**

    2.    **The proposed settlement class shares common questions of law and fact, satisfying both the commonality and typicality requirements**…**23**

        a.    Commonality is satisfied……………………………....………**24**

        b.    Typicality is satisfied…………………………………..………**24**

    3.    **The settlement class' interests are adequately represented by the class representatives**………………………………………………**25**

    4.    **Rule 23(b)(3) is satisfied because the settlement class's claims involve predominantly common issues and a class action is the superior means by which to adjudicate the claims**…………………...**26**

        a.    Common legal and factual questions predominate………………**26**

        b.    A class action is superior to other means of adjudicating the plaintiffs' claims……………………………………………………**27**

E.    **The Proposed Notice to Class Members is Adequate**……………………...........**29**

IV.    **CONCLUSION**………………………………………………………………**31**

# TABLE OF AUTHORITIES

*Cases*

*In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 179 (S.D.N.Y. 2005) _____23

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) _____24

*Ayzelman v. Statewide Credit Servs. Corp.*, 242 F.R.D. 23, 26 (E.D.N.Y. 2007) _____12

*Bank. v. Roper*, 445 U.S. 326, 339 (1980) _____27

*Banyai v. Zinn*, No. 00-9806, 2007 U.S. Dist. LEXIS 22342, at *25-26 (S.D.N.Y. Mar. 27, 2007) _____13

*Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992) _____20

*Consol. Edison, Inc. v. Northeast Utils.*, 332 F. Supp. 2d 639, 652 (S.D.N.Y. 2004) _____29

*Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) _____22

*Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 122 (S.D.N.Y. 2001) _____23

*D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001). _____12

*DeMarco v. Nat'l Collector's Mint, Inc.*, 229 F.R.D. 73, 81 (S.D.N.Y. 2005) _____26

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974): _____12

*First Equity Corp. of Florida v. Standard & Poor's Corp.*, 869 F.2d 175, 179-80 (2d Cir. 1989) _____16

*In re "A Million Little Pieces" Litig.*, 435 F. Supp. 2d 1336, 1337, 1338 (J.P.M.L. 2006). _____2

*In re "A Million Little Pieces" Litig.*, 435 F. Supp. 2d at 137-38 _____24

*In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 169 (2d Cir. 1987) _____30

*In re Blech Sec. Litig.*, 187 F.R.D. 97, 104 (S.D.N.Y. 1999) _____23

*In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 465-57 (S.D.N.Y. 2004) _____14

*In re Gulf Oil/Cities Service Tender Offer Litig.*, 142 F.R.D. 588, 590 (S.D.N.Y. 1992) _____12

*In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F. Supp. 729, 739 (S.D.N.Y. 1993) _____19

*In re NTL, Inc. Sec. Litig.*, 2006 WL 330113, at *13 (S.D.N.Y. Feb. 14, 2006). _____28

*In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000) _____24

*In re Painwebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) _____19

*In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 311 (3d Cir. 1998) _____23

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001), cert. denied, 536 U.S. 917 (2002) _____26

*In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 741 (S.D.N.Y. 1985) _____12

*Lacoff v. Buena Vista Publishing, Inc.*, 705 N.Y.S.2d 183, 190-92 (2000) _____16

*Lovely H. v. Eggleston*, 235 F.R.D. 248, 255 (S.D.N.Y. 2006) _____22

*Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002)_____14

*Marisol A. v. Giuliani*, 126 F. 3d 372, 376 (2d Cir. 1997) _____23

*Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir 1997) _____25

*Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) _____11

*McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, at 548 n.2 (5th Cir. 2003)_____23

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) _____29

*Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001) _____23

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 469 (S.D.N.Y. 2005) _____27

*In re Metropolitan Life Deriv. Litig.*, 935 F. Supp. 286, 293-94 (S.D.N.Y. 1996)_____17

*In re PaineWebber Ltd. P'ship Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997) _____13

*Rice v. Penguin Putnam, Inc.*, 734 N.Y.S.2d 98, 99-100 (2001) _____16

*Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)_____22

*Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001) _____23

*Taft v. Ackermans*, No. 02-7951, 2007 U.S. Dist. LEXIS 9144, at *18-19 (S.D.N.Y. Jan. 31, 2007) _____15

*Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 51 (S.D.N.Y. 2003) _____12

*Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 64 (S.D.N.Y. 2003) _____19

*v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) _____30

*Velez v. Majik Cleaning Serv., Inc.*, No. 03-8698, 2007 U.S. Dist. LEXIS 46223, at *19 (S.D.N.Y. June 22, 2007) 18

*Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988) _____29

*Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); _____11

*Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1037 (9th Cir. 1991) _____16

## Statutes

28 U.S.C. § 1407 _____2

***Rules***

Fed. R. Civ. P. 23(a)(1) _____22

Fed. R. Civ. P. 23(b)(3) _____26

Fed. R. Civ. P. 23(b)(3)(D)_____28

Fed. R. Civ. P. 23(e) _____11

***Treatises***

H. Newberg, *Newberg on Class Actions*, § 8.34 at 8-111 (3d. ed. 1992) _____29

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
### OF THEIR MOTION FOR FINAL APPROVAL OF SETTLEMENT.

## I.    INTRODUCTION

Plaintiffs, through co-lead class counsel Larry D. Drury, Ltd. and Brodsky & Smith,

LLC, respectfully submit this memorandum of law in support of their motion for final approval

of the proposed settlement in these consolidated actions.[1]  Plaintiffs submit that this settlement,

which the Court addressed in its Order Granting Motion for Preliminary Approval of Settlement,

dated May 15, 2007 (the "Preliminary Approval Order") (Doc. 66), is reasonable, fair and in the

best interests of the Settlement Class.  As explained below, plaintiffs submit that the proposed

settlement represents an excellent outcome for the Settlement Class, easily satisfies the criteria

for final approval, and therefore, this motion for final approval should be granted.[2]

## II.    BACKGROUND OF CASE AND SETTLEMENT

### A.    Factual and Procedural Background

This action arises out of the publication and marketing of the book *A Million Little Pieces*

by James Frey (the "Book").  The Book, which was published by defendant Random House, Inc.

in 2003, is based on Frey's experiences during a stay at a drug rehabilitation center and his

subsequent recovery from drug addiction.  After its publication, the Book gained critical success,

and in the Fall of 2005, it was chosen as a featured selection of the Oprah Winfrey Book Club.

The back cover classified the Book as "memoir/literature."

On January 8, 2006, the Smoking Gun, an investigative website, posted an article

claiming that several sections of Frey's book were "wholly fabricated or wildly embellished."

---

[1] A copy of the Settlement Agreement and Release (the "Settlement Agreement") is Exhibit A to the Declaration of
Evan J. Smith, dated January 4, 2007 (Docket Item 46 in 06 MD 1771 ("Doc.")) (the "January Smith Declaration").

[2] Plaintiffs intend on filing a separate petition for the approval of plaintiffs' attorneys' fees and reimbursement of
costs in the near future and thus, the issues of attorneys' fees and costs are not addressed in this memorandum.

"A Million Little Lies," THE SMOKING GUN (Jan. 8, 2006) (a true and correct copy is attached to the January Smith Declaration as Exhibit B). Frey later commented on these claims in televised appearances on *Larry King Live* (on January 11, 2006) and *The Oprah Winfrey Show* (on January 26, 2006). In his appearance on *The Oprah Winfrey Show*, Frey admitted that portions of the Book were not entirely accurate. Around this same time, Random House published on its website and included in subsequent printings of the Book an "Author's Note" and a "Publisher's Note" acknowledging Frey's statements concerning the accuracy of items in the Book.

In the wake of both the Smoking Gun article and Frey's appearance on *The Oprah Winfrey Show*, numerous putative class action lawsuits were filed around the United States against Frey, Random House, and other defendants. All of these lawsuits focus on (1) the author's alleged embellishments in the Book; (2) the labeling of the Book as a "memoir"; and (3) various other ways in which the Book was advertised, publicized, and marketed. Plaintiffs in the AMLP Actions allege similar legal theories, including common law and statutory claims of negligence, unjust enrichment, and consumer fraud.

In March 2006, Random House filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate and transfer all of the AMLP Actions pursuant to 28 U.S.C. § 1407. Each of the individual actions was stayed pending the JPML's decision. On June 14, 2006, the JPML granted the motion, finding that the AMLP Actions "involve common questions of fact, and that centralization … will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation," and transferred the AMLP Actions to this Court. *See In re "A Million Little Pieces" Litig.*, 435 F. Supp. 2d 1336, 1337, 1338 (J.P.M.L. 2006).

### B.    Settlement Background

While the petition to the JPML was pending, the parties commenced settlement discussions. Over the five months following the filing of the JPML Petition, there were substantial negotiations among the parties, involving hundreds of phone calls and e-mails, and numerous in-person meetings. *See* January Smith Declaration, ¶¶ 2-10. Beginning in March of 2006, Co-Lead Class Counsel, Larry D. Drury and Evan J. Smith, coordinated a large group of plaintiffs' counsel to negotiate with counsel for defendants Random House and Frey ("Defendants"). *Id.* These counsel met and discussed internally their objectives and potential settlement structures before meeting with Defendants' counsel.

On April 20, 2006, this large group of plaintiffs' counsel, coordinated by Drury and Smith, met in Chicago with all of the defense counsel to discuss the potential for a resolution of the AMLP Actions. *Id.* After that initial group meeting, proposals were exchanged among the parties with the broad outline of a proposed settlement. *Id.* After the exchange of numerous proposals with varying terms, and their consideration by the wider group of plaintiffs' counsel, Drury and Smith participated in a series of more targeted negotiations with the Defendants' counsel, which included at least six in-person meetings in Chicago,[3] and dozens of phone conferences. *Id.* Drury and Smith kept other plaintiffs counsel apprised of the developments in the settlement negotiations, and regularly received input from the wider plaintiffs' group on proposed responses to proposals submitted by Defendants. *Id.*

These extensive negotiations ultimately resulted in the execution of a formal Memorandum of Understanding ("MOU") on July 26, 2006, which was carefully reviewed and approved by eleven plaintiffs' counsel. *Id.* The parties then drafted an extensive written

---

[3] Drury met in person with defendants' counsel on the following dates: April 20; June 14, 22, 27; and July 5, 19. Smith participated in these meetings via telephone.

settlement agreement based on the terms contained in the MOU.  The same eleven plaintiffs'
counsel later signed the Settlement Agreement.

Following execution of the MOU, plaintiffs – working through Drury, Smith, and liaison
counsel Thomas Mullaney – sought and obtained substantial amounts of confirmatory discovery
in connection with the settlement, which was a condition precedent to settlement.  *Id.*  Indeed,
Plaintiffs received and reviewed more than 2,000 pages of materials and electronic documents
regarding various issues, including Book's sales numbers, the Book's rate of return, pricing
information, and information about Frey's royalties.  *Id.*  Plaintiffs were also given copies of
Random House's records regarding refund requests for the Book, as well as copies of other
written comments regarding the Book and the ensuing controversy that Random House and Frey
received from Book purchasers and consumers.

### C.    <u>Summary of the Settlement</u>

Following their review of the extensive confirmatory discovery materials, the parties
revised and completed the written settlement documents, and ultimately, reached an agreement
on all of the terms of a settlement, thus resolving this issue for class members less than nine
months after the filing of the first complaints.  The primary terms of the Settlement Agreement
(see January Smith Declaration at Exhibit A for complete terms), are as follows.

First, the Settlement Agreement contemplates the certification of a nationwide Settlement
Class, consisting of all persons who purchased the Book, in any format (including, but not
limited to, in hardback, trade paperback, cassette, CD, or any other electronic media), on or
before January 26, 2006. the date of Frey's widely-publicized appearance on *The Oprah Winfrey
Show*, during which Frey acknowledged that certain portions of the Book were not entirely
accurate.

Second, Defendants agreed to make available to the Settlement Class monetary compensation up to $2.35 million. The settlement agreement contemplates that this amount will be used to fund all settlement expenses, including compensation to the class, notice and settlement costs, and any attorneys' fees and incentive awards. Settlement Class members who believe they were misled by the marketing of the Book were entitled to submit claims for an amount equal to a full refund of the purchase price. (The claim form is simple to complete and does not require Settlement Class members to return the Book.). As is discussed below, based on the participation in the settlement to date, it is now clear that all claimants will receive a full refund of their purchase price.

Third, Defendants have also agreed to include a disclaimer in future Random House printings of the Book, indicating that not all portions of the Book are factually accurate. This set of disclaimers has appeared on the Random House website, and has been included in the Book, since the time of the January 26, 2006 episode of *The Oprah Winfrey Show* on which Frey appeared and discussed the Book.

Fourth, the Defendants have agreed to make a significant *cy pres* contribution that could be in excess of $235,000.00 divided between a number of agreed upon charities. The parties are presently discussing which specific charities should receive the *cy pres* contribution.

Fifth, in exchange for this consideration, the Settlement Class has agreed to provide a broad release of all claims, including any claims that were or could have been raised in the AMLP Actions that relate to the Book, so that Defendants can have complete peace with respect to the Book.

D. **Preliminary Approval of the Settlement**

On January 4, 2007, Plaintiffs submitted their motion for preliminary approval of the settlement and a supporting memorandum. (Docs. 42 and 43). Plaintiffs' preliminary approval motion was contested by one objector, plaintiff Sarah Rubenstein, who did not challenge the substantive terms of the settlement, but instead raised issues with both the language of the class notice – claiming that it did not adequately disclose the amount of attorneys' fees – and the proposed methods of distributing the class notice – claiming that the notice should have been distributed by e-mail to customers. *See* Doc. 50. Rubenstein argued that the parties should be required, as part of the notice program, to subpoena third-party booksellers in an attempt to obtain lists of customers that purchased the Book.

On April 6, 2007, the Court held a hearing to consider the preliminary approval motion and to evaluate the single objection. At the hearing, the Court requested that the parties provide additional submissions relating to the proposed notice program. Specifically, the Court requested that the parties investigate and report back on the feasibility of collecting names of Book purchasers from third-party booksellers. At the hearing, the Court also appointed Larry D. Drury, Ltd. and Brodsky & Smith, LLC as co-lead class counsel, and renewed the appointment of Thomas M. Mullaney as plaintiffs' liaison counsel. (Doc. 59).

In response to the Court's request, Plaintiffs conducted an extensive investigation into the possibility of providing supplemental e-mail notice and provided two additional submissions (along with supporting affidavits) to the Court. (Docs. 60, 61, 63, 64). Defendants also submitted an additional brief confirming the comprehensive nature of the notice program contemplated by the Settlement Agreement and addressing a number of other issues raised by the Court at the preliminary approval hearing.

On May 14, 2007, the Court entered its Preliminary Approval Order.  (Doc. No. 66).  The Court conditionally certified the following nationwide class for settlement purposes: "all persons who purchased the book *A Million Little Pieces*, in any format (including, but not limited to, in hardback, trade paperback, cassette, CD, or any other electronic media), on or before January 26, 2006."  Preliminary Approval Order, ¶ 2.  As part of the Preliminary Approval Order, the Court also directed the parties to proceed with the contemplated notice program.  Preliminary Approval Order, ¶¶ 7, 8.

### E.    Notice of the Settlement

The Notice program that the Court approved consisted of the following measures:  (1) mailing the notice to members of the Settlement Class whose names and addresses were known, (2) publishing the notice in two publications, *Parade* and *USA Weekend*, which are inserted into in excess of 1000 newspapers nationwide, and (3) establishing a toll-free phone number and website where class members could obtain additional information about the settlement.  In addition, the parties retained Rust Consulting, a well-respected class action settlement administrator to assist with both the publication notice and the receipt and evaluation of claims (the "Settlement Administrator").

The parties have now carried out the court-approved Notice program as follows:

1.    *Mailed Notice.*  On June 19, 2007, the long-form Class Notice, along with a claim form, was mailed by the Settlement Administrator to all individuals who purchased the Book on Random House's website.  At plaintiffs' insistence, before mailing the notice to these class members, the Settlement Administrator ran all of the listed addresses of these class member through the National Change Of Address database, to insure that Notice was sent to class

members' most recent address.  *See* Kimberly Ness Declaration, ¶¶ 4-16, filed

contemporaneously herewith.

2.      *Publication Notice.*  Kinsella/Novak Communication, Ltd. (Kinsella) a sister

company to Rust Consulting, is a leading advertising and notification consulting firm.  Kinsella

evaluated the unique characteristics of buyers of the Book in order to design a notice program

that would be effective in reaching class members.  Pursuant to the preliminary approval Order,

Kinsella caused the Publication Notice to appear in the required publications on two separate

dates.  *See* Kimberly Ness Declaration, ¶¶ 4-16.  In order to maximize the readership of the

Publication Notice, Plaintiffs' counsel arranged to have the Publication Notice appear in the

specified publications on two separate dates, rather than having the two publications appear on

the same date.  *Id.*  On June 24, 2007, the Publication Notice appeared in *USA Weekend*, a

magazine insert that appears in 612 newspapers across all 50 states, and on July 1, 2007, the

Publication Notice appeared in *Parade,* an insert that is included in 403 newspapers across all 50

states.  *Id.*  At the time the Notice was published, the circulation of *USA Weekend* was

approximately 22.7 million and *Parade* was approximately 32.7 million.  The Publication Notice

thus appeared in over 1000 newspapers, with a circulation of 55 million, that should reached

more than 116 million readers.  *Id.*

3.      *AMLP Phone Number and Website*.  Both the long-form Class Notice and the

Publication Notice provided class members with a toll-free phone number and a website address,

www.amlpsettlement.com (the "Settlement Website") pursuant to which they could obtain

additional information regarding the settlement.  *Id.*  The toll-free number was activated in mid-

June 2007, and has remained live since that point.  The toll-free number has allowed class

members to obtain additional information about the settlement, to order a copy of the settlement

8

notice and claim form, and to leave a message directly with the Settlement Administrator. The Settlement Website, which was designed by Plaintiffs in connection with the Settlement Administrator and has been hosted by the Settlement Administrator, was launched on June 13, 2007, and includes all of the key documents relating to the settlement. *Id.* Specifically, the Settlement Website allows class members to view (and download) the long-form Class Notice, the Publication Notice, the Preliminary Approval Order, and the Settlement Agreement. Moreover, the Settlement Website provides class members the ability to download claim forms. It also provides links directly to information regarding Class Counsel and a series of answers to frequently asked questions ("FAQs") relating to the settlement. Pursuant to the Settlement Agreement, Random House, Frey (through Big Jim Industries), and the Settlement Administrator all established links to the Settlement Website from their own websites.

By all accounts, the Settlement Website has served as a comprehensive resource for class members. In addition to the fact that it is referenced in the Class Notice and Publication Notice, and directly linked from Random House's, Frey's and the Settlement Adminstrator's own websites, the Settlement Website is easily accessed through a search of Google, Yahoo!, and other internet search engines.[4] As of Monday, September 17, 2007, the website has received more than 7,000 visits. As of the date of this filing more than 1400 visitors have visited the FAQs page, and more than 4,000 claim forms have been downloaded. *Id.*

4. *Additional Media Coverage.* In addition to the mailed notice, Publication Notice, and internet notice described above, the Settlement has also received significant coverage from

---

[4] The link to the Settlement Website appears on the first page of a Google search result for a variety of different search terms including: "a million little pieces settlement"; "book little settlement"; "million book settlement"; "class action pieces"; "amlp lawsuit"; "amlp action"; "book refund million pieces"; "book refund amlp"; "refund amlp"; "class action amlp"; "frey amlp settle"; "james amlp settle"; "random house class settlement"; "random house settle"; "random house amlp class"; "million pieces lawsuit"; "claim form amlp"; "settle pieces"; and "amlp settle."

the media.  Specifically, after the Court granted preliminary approval, the Court's decision was covered by a number of media outlets, including but not limited to, *the New York Times, The Wall Street Journal, and MSNBC. See* 09-24-07 Smith Declaration.

To date, the approximate total for notice costs in connection with the settlement is $334,984.00.  The bulk of these costs (more than $332,484.00) are attributable to the expansive Publication Notice program described above.  *See* Kimberly Ness Declaration, ¶¶ 4-16.  The remainder of the costs were paid to the Settlement Administrator in connection with their work on, among other things, printing and mailing the Long-Form Notice, designing and hosting the Settlement Website, implementing and administering the toll-free number, receiving, reviewing and processing claims and other submissions relating to the settlement, and updating and advising all counsel regarding claims information and administrative issues.  In light of the broad reach of the Publication Notice and the invaluable assistance of the Settlement Administrator, Plaintiffs believe these costs, although significant, were a worthwhile investment that has benefited the Settlement Class and enabled more than a thousand class members to submit claims.

## F.    Class Members' Responses to the Settlement

As of Monday, September 17, 2007 – two weeks from the expiration of the claims period – a total of 1,345 claims have been submitted.  Given this current total and based on the recent trends in claim volumes, Plaintiffs anticipate that there will be a total of 1,600 total claims (the deadline for submission is October 1, 2007).  *See* Kimberly Ness Declaration, ¶¶ 4-16.This means that each claimant will receive a <u>full refund</u> of his or her purchase price of the Book, including not only the purchase price, but also any taxes paid, and (where applicable), any shipping and handling charges.  Moreover, the claims process provided for in the Settlement

Agreement did not require class members to return the Book to participate in the settlement; instead, they were required only to return one page (for hardcover purchases) or the front cover (for trade paperback purchases). Thus, all participating class members have been made more than whole – not only getting a refund of the purchase price, but also getting to keep the Book.

### G.    Objections and Opt-outs

The Preliminary Approval Order provides that members of the Settlement Class had "until August 23, 2007, to file with this Court a written objection to the settlement, as set forth in the Settlement Agreement and paragraph 15 of [the Preliminary Approval Order], and shall otherwise have no right to object to the Settlement Agreement." Preliminary Approval Order, ¶ 11, 15. Furthermore, all requests for exclusion from the Settlement Class were to be mailed to Settlement Class Counsel and received by August 23, 2007. Preliminary Approval Order, ¶ 14.

The deadlines for objections and opt-outs has now passed. No member of the Settlement Class has filed an objection to the Settlement.[5] In addition, only one individual advised either class counsel, defense counsel and/or the claims administrator of his/her desire to opt out of the settlement.

---

[5] One objection was received by counsel in the mail. However, the objector did not comply with this Court's May 15, 2007 Preliminary Approval Order. Specifically, the objection was not filed with the Court despite the objector being represented by counsel and despite both this Court's Order and the Publication Notice directing objectors to file such objections with the Court. *See* Doc. 66 ¶¶ 11, 15 and Doc. 68, both of which were available on PACER and the settlement website www.amlpsettlement.com. Based upon this failure to properly file the objection with the Court, the objection should be considered waived pursuant to the May 15, 2007 Order.

Nevertheless, even if the Court were inclined to consider the objection, it would not prevent entry of final approval. The substance of this lone defective objection relates to the information contained in the Publication Notice, and raises an issue that is virtually identical to one raised at the preliminary approval stage by plaintiff Sara Rubenstein concerning only the adequacy of the disclosure of attorneys' fees. *See* Doc. 50, at p. 8. In granting preliminary approval, this Court rejected all of plaintiff Rubenstein's objections to the settlement and notice plan, including the objection regarding the need to identify the amount of attorneys' fees that plaintiffs' counsel would seek. *See* Docs. 50, 59 and 66, and oral argument transcript from April 6, 2007 hearing. Having rejected this argument at the preliminary approval stage, it should likewise be rejected again now. Moreover, said defective objection also raises an issue regarding the adequacy of the settlement. However, since all of the claims made by class members will be paid in their entirety, there can hardly be a meritorious argument that the settlement is not adequate. *See* Legal Argument Section III(B)(6) *infra.*at p.19-20.

III.    **THE SETTLEMENT MEETS THE CRITERIA NECESSARY FOR THIS COURT TO GRANT FINAL APPROVAL**

A.    **Standards Governing Approval**

Rule 23(e) of the Federal Rules of Civil Procedure governs the settlement of class actions, and requires court approval before any settlement is executed. Fed. R. Civ. P. 23(e). The critical inquiry in evaluating a proposed settlement of a class action is whether the proposed compromise is "fair, reasonable, and adequate." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *see also Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995). To determine whether this standard has been met, the Court must "compare the terms of the compromise with the likely rewards of litigation." *In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 741 (S.D.N.Y. 1985). The Court must evaluate both the substantive and the procedural fairness of a class action settlement. *Ayzelman v. Statewide Credit Servs. Corp.*, 242 F.R.D. 23, 26 (E.D.N.Y. 2007), citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001). In evaluating the substantive fairness of a proposed settlement, the Court is guided by the following nine factors, initially enumerated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974):

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

*D'Amato*, 236 F.3d at 86 (citations omitted); *see also In re Gulf Oil/Cities Service Tender Offer Litig.*, 142 F.R.D. 588, 590 (S.D.N.Y. 1992) (applying *Grinnell* factors); *Warner*, 618 F. Supp. at 740-741 (same).

Rather than requiring a finding that all nine *Grinnell* factors have been satisfied, the

Court should instead "consider the totality of these factors in light of the particular

circumstances." *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 51 (S.D.N.Y. 2003) (citations

omitted). The Court must also examine the negotiating process that gave rise to the settlement to

determine if it was achieved through arms-length negotiations by counsel with the experience

and ability to effectively represent the class's interests. *See Warner*, 618 F. Supp. at 741; *see

also D'Amato*, 236 F.3d at 85 ("The District Court determines a settlement's fairness by

examining the negotiating process leading up to the settlement as well as the settlement's

substantive terms.").

**B.    Application of the *Grinnell* Factors Supports Approval of the Settlement**

The Settlement satisfies all of the criteria for approval of a class action settlement

articulated by the Second Circuit in *Grinnell*.

**1.    The complexity, expense and likely duration of the litigation.**

Although the claims in this case are not exceedingly complex, the fact that Plaintiffs were

able to negotiate a favorable settlement at an early stage in the litigation militates in favor of the

approval of the Settlement. *See In re PaineWebber Ltd. P'ship Litig.*, 171 F.R.D. 104, 126

(S.D.N.Y. 1997) (noting the large expense of future "discovery proceedings, motion practice,

trials, and likely appeals" that would cause any recovery to "be eroded by the costs of

prosecuting the action"). Indeed, continuing with the litigation would cause all parties to incur

substantial expense. Factual issues may preclude this case from being resolved before trial, thus

increasing the risk of incurring extensive additional expenses. As a result, even in the absence of

a great deal of complexity, this Court should find this factor to weigh in favor of approving the

Settlement because of the potential for all parties to sustain great expense in proceeding with the

litigation.  *See Banyai v. Zinn*, No. 00-9806, 2007 U.S. Dist. LEXIS 22342, at *25-26 (S.D.N.Y.

Mar. 27, 2007) (finding this factor to weigh in favor of settlement notwithstanding the fact that

discovery in the case was complete because important issues of material fact were in dispute and

"a trial would drain additional resources from all the parties").

> ### 2.    The reaction of the class to the settlement.

The Settlement Class's reaction to the Settlement also strongly supports approval.  The

Parties completed an extensive notice plan, as described above and outlined in the Settlement

Agreement and approved in the Preliminary Approval Order.  Notice was mailed to members of

the Settlement Class whose names and addresses were known, and notice was published in

*Parade* and *USA Weekend*, which are inserted into over 1000 newspapers nationwide, covering

every state.  *See* Ness Declaration ¶¶4-16.  Despite this extensive notice campaign, and despite

the media attention generated by the settlement, only one member of the Settlement Class elected

to opt out of the settlement, s*ee* September Smith Declaration, and no objections were filed with

this Court.[6]  As Courts have noted, a low number of opt-outs and objections – especially in a

class as large as this one – strongly confirms the fairness of the settlement.  *See Thompson*, 216

F.R.D. at 62 ("[i]n view of the extensive notice campaign . . . the extremely small number of

class members objecting or requesting exclusion from the settlement is a clear sign of strong

support for the settlement"). The Court should find this factor to weigh heavily in favor of final

approval of the Settlement.

> ### 3.    The stage of proceedings and the amount of discovery completed.

This case was settled at an early stage, so that the class will be able to benefit now – not

years later when this controversy will have been forgotten – from the Settlement.  Courts have

---

[6] As noted in footnote 4 above, the lone objector's failure to comply with this Court's May 15, 2007 Order should render the objection waived  However, as explained above, even if the court were inclined to consider the objection, it should be denied on the merits.

generally found that an early resolution of a class action is favorable to the class and merits

approval. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 465-57 (S.D.N.Y.

2004) ("[T]he proposed partial settlement would grant relief to all class members without

subjecting them to the risks, complexity, duration, and expense of continuing litigation. . . . [and]

maximize the recovery of insurance money for the class."); *Maley v. Del Global Techs. Corp.*,

186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("Settlement at this juncture results in a substantial

and tangible present recovery, without the attendant risk and delay of trial. These factors weigh

in favor of the proposed settlement."). And although no formal discovery was undertaken in this

case, this is not the sort of case where many of the facts were unknown to Plaintiffs' counsel. In

any event, Plaintiffs' counsel conducted their own pre-suit investigation of the key facts, many of

which were confirmed by contemporaneous press reports or confirmed later as part of the

confirmatory discovery process. In addition, defendant Frey gave a number of public statements

concerning the claims made about the Book, so plaintiffs' counsel had extensive knowledge

about the underlying facts before the lawsuits were even filed and before they commenced

settlement discussions.

Once a settlement was reached, Plaintiffs also conducted substantial confirmatory

discovery, during the course of which they reviewed more than 2,000 pages of materials and

electronic documents regarding the Book, including sales numbers, the Book's rate of return,

pricing information, and Frey's royalties. *See* January Smith Declaration, ¶¶ 2-10. Plaintiffs

were also provided copies of Random House's records regarding refund requests for the Book, as

well as copies of other written comments regarding the Book that Random House and Frey

received from Book purchasers and customers. *Id.* The confirmatory discovery enabled

Plaintiffs' counsel to formulate "a clear view of the strengths and weaknesses of their case[] and

of the adequacy of the settlement." *Taft v. Ackermans*, No. 02-7951, 2007 U.S. Dist. LEXIS 9144, at *18-19 (S.D.N.Y. Jan. 31, 2007) (internal quotations and citations omitted). Accordingly, application of this factor also weighs in favor of settlement approval.

### 4.    The risks of the class prevailing.

While Plaintiffs believe they have a strong case, they recognize the potential risks associated with proceeding in this litigation. Plaintiffs have recognized at least three risk factors that militate in favor of a settlement, rather than a lengthy contested proceeding.

First, Plaintiffs' counsel were well aware that Defendants would likely move to dismiss the AMLP Actions, and there was a not insubstantial risk that those motions could have been granted. In fact, plaintiffs' concerns on this issue were underscored at the hearing before the JPML, at which Judge Motz specifically inquired of counsel for Random House whether a motion to dismiss would be filed (and its counsel confirmed that such a motion was forthcoming). *See In re "A Million Little Pieces" Litigation*, 5/26/2006 Hearing Before the JPML at 3, a true and correct copy of the transcript is attached to the Janaury Smith Declaration as Exhibit D. Judge Motz suggested that, once the motion was filed, there might be no actions left to consolidate, strongly suggesting to plaintiffs' counsel that their claims were on shaky legal footing. *Id*. (In response to a comment regarding the sort of discovery that would be necessary if the actions get past a motion to dismiss stage, Judge Motz stated, "If you get beyond it. I assume [Defendants] intend to file a motion.").

Plaintiffs have reviewed the relevant case law, and while they believe their claims could have survived a motion to dismiss, the outcome is hardly certain. At least one court has held that the type of speech made in the Book here is protected by the First Amendment, and cannot form the basis of a consumer fraud claim. *See Lacoff v. Buena Vista Publishing, Inc.*, 705 N.Y.S.2d

183, 190-92 (2000).  Another court dismissed a similar consumer fraud class action, involving

alleged misrepresentations about the identity of a book's author, finding that the plaintiff's

allegation that the class "would not have purchased the novel had they known [the truth]" was

not a legally cognizable injury.  *Rice v. Penguin Putnam, Inc.*, 734 N.Y.S.2d 98, 99-100 (2001).

Finally, with respect to Plaintiffs' claims against Random House – the only real deep pocket in

this litigation – many cases hold that publishers "have no duty to investigate the accuracy of the

contents of the book they published."  *Id*. at 192; *see also Winter v. G.P. Putnam's Sons*, 938

F.2d 1033, 1037 (9th Cir. 1991); *First Equity Corp. of Florida v. Standard & Poor's Corp.*, 869

F.2d 175, 179-80 (2d Cir. 1989).   Even if Plaintiffs survived dismissal, Plaintiffs would likely

have confronted these same issues at the summary judgment stage, and again, the outcome is

uncertain.

Second, while Plaintiffs believe class certification is appropriate for these claims, there is

uncertainty as to whether a class could be certified on a contested basis.  Again, both Defendants

and the JMPL judges questioned whether a contested class (as opposed to a settlement class)

could be certified.  A court might conclude that each individual Class member would be required

to demonstrate both that they actually relied upon representations that the Book was nonfiction,

and that those representations affected their decision to buy the Book.  Because each Plaintiff's

assessment of the Book's value as a work with embellishments will invariably differ, this Court

could conclude that the claims are too individualized to be certified as a Rule 23(b)(3) class

(because common issues would not predominate).  Obviously, attempting to depose each

individual Class member to assess these issues of causation and damages would be impractical.

*See, e.g., In re Metropolitan Life Deriv. Litig.*, 935 F. Supp. 286, 293-94 (S.D.N.Y. 1996)

(finding that the need to depose 23 deponents located all over the country was sufficiently burdensome to support reaching a settlement).

At the hearing before the JPML, Judge Motz alluded to these problems and cast doubt on plaintiffs' chances for certification of a class, noting that the plaintiffs' claims will necessarily "depend upon depositions of each individual plaintiff as to whether or not … they really … thought they were buying the work of nonfiction," and whether "as a work of fiction, [the Books] still have some value." *See* Smith Declaration Exhibit D at 7.

Third, while Plaintiffs will vigorously prosecute this action if the settlement is not approved, the fact remains that proceeding with the litigation is time-consuming and costly to all parties, and the ultimate outcome is far from clear.

Under these circumstances, obtaining an early and favorable resolution of the action is plainly in the class's best interests. *See, e.g., Velez v. Majik Cleaning Serv., Inc.*, No. 03-8698, 2007 U.S. Dist. LEXIS 46223, at *19 (S.D.N.Y. June 22, 2007) (finding that the risks of establishing liability and damages weigh in favor of approving the settlement because each plaintiff would benefit "in that he or she will recover a monetary award immediately, without having to risk that an outcome unfavorable to the plaintiffs will emerge from a trial.").

### 5.    The ability of the defendants to withstand a greater judgment.

Although it is likely that the corporate defendant, Random House, could withstand a greater judgment than that provided for in the Settlement, Plaintiffs believe that this factor also counsels for settlement approval because Plaintiffs successfully negotiated a favorable settlement with both Random House and Frey.  Although Plaintiffs are not aware of how defendants are dividing the settlement payments that must be made, Plaintiffs note that the ultimate settlement figure represents a significant portion of the royalties earned by Frey for the Book.  It is further

extremely unlikely that the individual Defendant, James Frey, could withstand a judgment against him individually in an amount of the alleged liability to the class  *See In re Global Crossing*, 225 F.R.D. at 460 (noting that settling defendants were individuals with assets far less than the alleged liability of the class action).  In this regard, as is discussed below, there is no question that the settlement that Plaintiffs' counsel was ultimately able to obtain for the class was hard-fought and has imposed a significant burden on Defendants.

In any event, even if all the Defendants could withstand a greater judgment, the Court should "consider the totality of [all] factors in light of the particular circumstances" and accordingly this factor "alone does not support the inference that the settlement is unfair." *Thompson*, 216 F.R.D. at 51, 64, citing *In re Painwebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997).

> **6.    The range of reasonableness of the settlement fund in light of the best possible recovery and all the attendant risks of litigation.**

Given the number of claims that have been submitted to date, and the expected number of claims that will be submitted before the October 1 claims submission deadline, it is now clear that the amount of the settlement fund obtained by Plaintiffs will be more than sufficient to fully compensate every member of the Settlement Class who timely submitted a claim.  Each of the participating settlement class members will receive the full purchase price of his or her copy of the Book, including taxes and shipping and handling.   In this regard, there is no question that application of this *Grinell* factors militates in support of settlement approval.  *See Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 64 (S.D.N.Y. 2003) (finding settlement fully compensating class members for economic injuries "preferable to the speculative recovery that may be secured after lengthy and expensive litigation").  In fact, settlements awarding class members far less than full compensation have routinely been approved, and have often been deemed highly

favorable.  *See Maley*, 186 F. Supp. at 365-66 (finding a 41 percent recovery of plaintiff's

alleged damages to be "highly favorable" in comparison with other settlements); *In re*

*McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F. Supp. 729, 739 (S.D.N.Y. 1993) (finding

that although district courts should not "rubber stamp" settlements awarding over 50 percent of

the maximum potential liability, a 54 percent recovery was reasonable, fair, and adequate).

Moreover, the amount of the settlement fund itself is generous, especially in light of the

uncertainties in the litigation described above and the actual damage suffered by class members.

Even assuming the value of the Book was somewhat diminished by the fact that certain portions

were not entirely accurate, the value of the Book to each purchaser was not necessarily reduced

to zero (and as a practice, books classified as fiction do not generally sell for a lower price than

nonfiction books).  Also, because participating class members are not required to return the Book

in order to obtain a refund, they will also retain any benefits that they may have received from

reading and owning the Book.

Finally, even if the amount of the settlement fund had not been sufficient to fully

compensate every member of the Settlement Class, the Second Circuit has stated that "[t]he fact

that a proposed settlement may only amount to a fraction of the potential recovery does not, in

and of itself, mean that the proposed settlement is grossly inadequate and should be

disapproved."  *Grinnell*, 495 F.2d at 455.  The Second Circuit further explained that, "[i]n fact

there is no reason, at least in theory, why a satisfactory settlement could not amount to a

hundredth or even a thousandth part of a single percent of the potential recovery."  *Id*. at 455 n.2.

### C.    <u>The Proposed Settlement Is Procedurally Fair</u>

Where a "settlement is the result of arm's length negotiations conducted by experienced

counsel after adequate discovery and the settlement provokes only minimal objections, then it is

entitled to '[a] strong initial presumption of fairness.'" *In re Global Crossing*, 225 F.R.D. at 461

(quoting *Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992)).

Such a presumption is appropriate here for at least three reasons. First, the negotiations occurred

between experienced counsel. Plaintiffs' counsel from nine of the pending AMLP Actions

actively participated in the settlement negotiations. Indeed, the co-lead class counsel who

spearheaded the negotiations has been appointed Lead or Co-Lead Counsel in various complex

and/or class action litigation by state and federal courts across the country. *See AMLP Plaintiffs*

*Group's Motion for Co-Interim Class Counsel* previously filed in this action. (Docs. 43, 46)

Moreover, Settlement Class Counsel as a whole has vast experience in complex and/or class

litigation. This combined experience provides the Settlement Class Counsel with the ability to

effectively represent the Class members' interests. *See D'Amato*, 236 F.3d at 85 (not an abuse

of discretion to find settlement procedurally fair where plaintiffs' counsel was experienced in

complex class actions). In addition, Defendants are represented by lawyers from two of the

nation's largest law firms, and those lawyers each have substantial experience in defending class

actions and negotiating settlements.

Second, the settlement agreement was the product of extensive negotiations and took

place between attorneys with competing interests. The attorneys met numerous times starting in

April of 2006, and the terms of the Settlement Agreement were only agreed upon after several

months of hard fought negotiations. *See* Section I(C), *supra.* and January Smith Declaration ¶¶

2-10.

Third, Class Counsel have concluded that this Settlement Agreement is fair, reasonable,

adequate, and in the best interests of the Settling Class. *See* Final Approval Declarations of

Larry D. Drury and Evan J. Smith, all filed contemporaneously herewith. During the settlement

negotiations, counsel had more than adequate information regarding the strengths and weaknesses of Plaintiffs' case. Indeed, throughout the negotiations, the parties pressed their respective strengths. Plaintiffs also considered the weaknesses of their case, the risks posed by further litigation, the likely recovery at trial, and the risks and delays of the inevitable appeals that would follow a trial. In addition, Plaintiffs did not finally settle this Action against the Defendants until they performed additional confirmatory discovery (including the review of 2,000 pages of documents), confirming the Defendants' representations during settlement negotiations. *See* January Smith Declaration, ¶¶ 2-10. As great weight is given to the recommendation of "counsel, who are most closely acquainted with the facts of the underlying case," this Court should take seriously Class Counsel's determination that this Settlement meets the prerequisites for final approval. *See In re PaineWebber*, 171 F.R.D. at 125 (citation omitted).

### D.    The Settlement Class Meets The Standards for Certification Under Rule 23.

Certification of a settlement class allows courts "to utilize the class device . . . to best serve the ends of justice for the affected parties and to promote judicial efficiencies." *Weinberger*, 698 F.2d at 72. The Second Circuit has recognized that "[t]emporary settlement classes have proved to be quite useful in resolving major class action disputes." *Id*. As the Court preliminarily recognized at the  April 6, 2007 hearing, the proposed Settlement Class satisfies the numerosity, commonality, typicality and adequacy requirements of Rule 23(a)(1)-(4) and the predominance and superiority requirements of Rule 23(b)(3).

### 1.    The numerosity requirement is satisfied.

Rule 23(a)(1) requires that a class be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). A party does not need to prove the exact number or size of the class to satisfy this requirement. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). A

good faith estimate is sufficient. *Lovely H. v. Eggleston*, 235 F.R.D. 248, 255 (S.D.N.Y. 2006). Moreover, the number of class members necessary to sufficiently show numerosity is quite low; the Second Circuit has noted that numerosity can be presumed once a class consists of at least forty people. *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

The Settlement Class plainly satisfies the numerosity requirement of Rule 23(a). The Class includes all people who bought the Book (in any format) on or before January 26, 2006. Approximately 3.5 million copies of the Book were sold during that period. *See* 09-24-07 Smith Declaration, filed concurrently herewith. Even assuming that some consumers may have bought multiple copies of the Book, the number of potential Class members will still number in the millions. *See, e.g., In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 179 (S.D.N.Y. 2005) (finding numerosity where "there are likely thousands or even tens of thousands of potential members of the putative class"). Therefore, the numerosity factor is satisfied.

**2.    The proposed settlement class shares common questions of law and fact, satisfying both the commonality and typicality requirements.**

The commonality requirement of Rule 23(a)(2) and typicality requirement of Rule 23 (a)(3) are discussed herein together because courts treat them as closely linked and evaluate them on much the same basis. *See, e.g., In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 311 (3d Cir. 1998) ("The concepts of commonality and typicality are broadly defined and tend to merge."). The threshold for satisfying these two requirements is not high. *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, at 548 n.2 (5th Cir. 2003); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001).

The commonality inquiry "asks if the named plaintiffs' 'grievances share a common question of law or of fact' with those of the proposed class…" *Cromer Fin. Ltd. v. Berger*, 205

F.R.D. 113, 122 (S.D.N.Y. 2001) (quoting *Marisol A. v. Giuliani*, 126 F. 3d 372, 376 (2d Cir. 1997)).  *See also In re Global Crossing,* 225 F.R.D. at 451.  Typicality is satisfied if "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001); *see also In re Blech Sec. Litig.*, 187 F.R.D. 97, 104 (S.D.N.Y. 1999) (plaintiff alleging common course of conduct arising out of single set of operative facts satisfies commonality requirement).  "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37.  *See also* Fed. R. Civ. P. 23(a)(3); *Robinson*, 267 F.3d at 155; *In re Global Crossing*, 225 F.R.D. at 452.  The purpose of this requirement is to ensure that the named plaintiffs will fairly represent and pursue the claims of all the class members, rather than merely their own.  *See In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000) ("Rule 23 requires that a class representative have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions") (internal quotation and citation omitted).

a.    <u>Commonality is satisfied.</u>

As was recognized by the JPML in its decision to consolidate the AMLP Actions for pretrial proceedings, all of the Settlement Class members' claims arise out of common questions of facts, including "i) that the book contained material fabrications, and ii) that advertisements and marketing concerning the book were false and misleading inasmuch as the book was marketed as a work of nonfiction." *In re "A Million Little Pieces" Litig.*, 435 F. Supp. 2d at

137-38**.**  The Settlement Class members also share common legal theories, including nearly

identical allegations of negligence and fraud.  Because of these common issues, the second of the

certification requirements is met.

b.      <u>Typicality is satisfied.</u>

Here, the Named Plaintiffs' claims are clearly typical of the Class.  As discussed *supra*,

all of the Settlement Class's claims arise out of misrepresentations that the Defendants allegedly

made about the Book and are based on similar legal arguments.  The relief sought is also

sufficiently typical for purposes of settlement-only certification since the alleged injuries all arise

out of the same conduct.  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (problems

related to intractable management problems are not concerns when a class is being certified only

for settlement purposes).  Therefore, the degree of typicality needed to certify a settlement class

is met.

### 3.    The settlement class' interests are adequately represented by the class representatives.

Representation is adequate under Rule 23(a)(4) if "the representative parties will fairly

and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  A court must

examine two issues to determine the adequacy of a class representative: (1) whether the class

representatives' claims conflict with those of the class, and (2) whether class counsel is qualified

and capable of conducting the litigation.  *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir

1997); *In re Global Crossing*, 225 F.R.D. at 453.  Here, none of the Class representatives has

interests adverse to the Settlement Class as a whole, and counsel for the plaintiffs are qualified to

represent the Class.

All of the Settlement Class members share a common goal: to seek the maximum

possible recovery for alleged injuries arising out of the same set of facts.  There is no reason to

25

doubt that the representatives will vigorously and fairly represent the Class members, and no

conflicting, or potentially conflicting, interests have been raised by any party.

A court's assessment of the adequacy of class counsel focuses on whether that counsel is

"qualified, experienced and generally able to conduct the proposed litigation." *Marisol A.*, 126

F.3d at 378.  Class Counsel has extensive experience in complex class action litigation.

Counsel's capability and willingness to vigorously represent the interests of the Class members

has already been demonstrated by their serious involvement in the extensive negotiations that led

to the current Settlement Agreement.  *See* Section II(C), *supra.*,.  Thus, Class Counsel, like the

representatives, are fully qualified to represent the Settlement Class in these proceedings, and

satisfy the requirements of Rule 23(a)(4).

> **4.    Rule 23(b)(3) is satisfied because the settlement class's claims involve predominantly common issues and a class action is the superior means by which to adjudicate the claims.**

Rule 23(b)(3) is satisfied where common questions of law or fact predominate over

individual questions.  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir.

2001), cert. denied, 536 U.S. 917 (2002).  The Rule also requires proof that a class action is

superior to other available methods of adjudication.  Fed. R. Civ. P. 23(b)(3).  The Settlement

Class here meets both of these requirements.

> a.    <u>Common legal and factual questions predominate.</u>

To establish predominance, a party must establish that classwide issues overshadow

questions requiring individualized proof.  *Amchem*, 521 U.S. at 625 ("The Rule 23(b)(3)

predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant

adjudication by representation."); *see also DeMarco v. Nat'l Collector's Mint, Inc.*, 229 F.R.D.

73, 81 (S.D.N.Y. 2005).  "Predominance is a test readily met in certain cases alleging consumer

… fraud," and has been found where the claims are all based on the same allegedly fraudulent conduct by defendants. *Amchem*, 521 U.S. at 623; *DeMarco*, 229 F.R.D. at 81 (finding predominance where all class members alleged that the defendants failed to properly mark product as "COPY").

The claims of the Settlement Class are predominantly common. All of the allegations are based on the Defendants' alleged public misrepresentations. The claims also involve the same alleged injuries, namely, the purchase of the Book under false pretenses. Furthermore, "[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *In re Visa Check/MasterMoney*, 280 F.3d at 139; *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 469 (S.D.N.Y. 2005) ("On their own, individualized damage issues rarely prevent certification."). Therefore, while the damages inquiries may be more individualized, predominance can still be established. Furthermore, because the Class here is being certified only for settlement purposes, concerns related to potential variations in damages are not relevant.

        b.     A class action is superior to other means of adjudicating the plaintiffs' claims.

Factors considered by courts when assessing whether a class action is superior include the class members' interest in individually controlling the prosecution of separate actions, the extent and nature of any litigation concerning the same controversy already commenced by members of the class, the desirability of concentrating the litigation in one forum, and the possible difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3); *In re Visa Check/MasterMoney*, 280 F.3d at 133. All of these considerations demonstrate that a class action is the most sensible process to use here.

First, the interests of the Class members are far better served by a class action, especially in the context of a settlement. The costs of litigating individual actions would be much more expensive than the potential amount that any single plaintiff could recover, making it unlikely that any individual would even pursue litigation on their own. *See, e.g., Deposit Guar. Nat. Bank. v. Roper*, 445 U.S. 326, 339 (1980) (noting that a class action is far superior where "it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages"); *DeMarco*, 229 F.R.D. at 81 (finding a class action superior where "[t]he amount of money each member of the class is suing for is so small that it is unlikely that any individual would be able to maintain a lawsuit to obtain redress"). In addition, even if an action were to proceed on a individual basis, the plaintiffs would be unlikely to achieve a settlement as favorable as the one being offered here.

The second factor – the extent and nature of any currently pending litigation of the matter – also cuts in favor of certifying the Settlement Class here. The only pending actions in this matter have all been consolidated and transferred to this Court for pretrial proceedings. Prior to consolidation, no discovery had commenced in any of the actions. Thus, all of the actions are in the very early stages of litigation, and no plaintiff will be prejudiced by settlement.

As to the issue of the desirability of a specific forum, this jurisdiction is the optimal location in which to settle the Settlement Class's claims. All of the actions are currently pending here. Furthermore, this jurisdiction is the most convenient site for resolution of the Settlement Class's claims for the same reasons that the Actions were transferred here for pretrial proceedings: the publishing and individual defendants are located in New York, and most of the relevant documents and witnesses are likely to be found here. And, of course, simply from the standpoint of judicial efficiency, "[t]he interests of justice will be well served by resolving the

28

common disputes of potential class members in one forum." *In re NTL, Inc. Sec. Litig.*, 2006 WL 330113, at *13 (S.D.N.Y. Feb. 14, 2006).

The final factor – the manageability of the class action – is not at issue where certification of a settlement class is being considered. *Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial."). Because all of the certification requirements of Rule 23 applicable to settlement are satisfied, this Court should certify the Settlement Class for all settlement proceedings.

### E.    The Proposed Notice to Class Members is Adequate.

Federal Rule of Civil Procedure 23(c)(2) requires that class members be provided "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." An adequate notice must fairly apprise class members of the proposed settlement terms and inform them of their options. *Weinberger*, 698 F.2d at 72; *see also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). However, whether a notice satisfies due process requirements will vary by situation, "and each and every class member need not receive actual notice, so long as class counsel acted reasonably in selecting means likely to inform persons affected." *In re Stock Exch. Options Trading Antitrust Litig.*, No. 99 Civ. 0962, 2006 U.S. Dist. LEXIS 87825, at *22 (S.D.N.Y. Dec. 4, 2006) *citing Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988).

Courts in this Circuit require notice to provide the following information to comport with due process: (1) the nature of the litigation; (2) the general terms of the settlement; (3) where complete information can be located; and (4) the time and place of the fairness hearing so that

29

objectors may be heard.  *See Consol. Edison, Inc. v. Northeast Utils.*, 332 F. Supp. 2d 639, 652

(S.D.N.Y. 2004); H. Newberg, *Newberg on Class Actions*, § 8.34 at 8-111 (3d. ed. 1992).

As is set forth above in Section II(E), the Notice here satisfies the requirements under

Rule 23(c)(2) and due process.  The Notice describes in clear and plain English (i) a summary of

the litigation; (ii) the terms and operation of the Settlement; (iii) the nature and extent of the

release; (iv) the method by which counsel fees will be determined; (v) the procedure and timing

for objecting to the settlement; and (vi) the date and place of the fairness hearing.  The Notice

was delivered through first-class mail to every Settlement Class member whose name and

address is reasonably available.  *See* Kimberly Ness Declaration, ¶¶ 4-16.  *See also Eisen v.

Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) (providing that individual notice must only be

provided to "class members whose names and addresses may be ascertained through reasonable

effort").  Here, that group consists only of persons who purchased the Book through the Random

House website.

The remainder of the Settlement Class members, whose names and addresses are not

known to Defendants, were notified of the proposed settlement through the Publication Notice in

*Parade* and *USA Weekend*, two weekly supplements that are inserted into approximately 885

newspapers across the country.  *See* Kimberly Ness Declaration, ¶¶ 4-16.  The parties' counsel

engaged Rust Consulting, a well-known class action administrator who has designed hundreds of

notice plans.  Rust evaluated the unique characteristics of buyers of the Book in order to design a

notice program that would be effective in reaching class members.

In addition to the nationwide publication notice program, as is described in detail above,

the Settlement Administrator has established a toll-free number and Settlement Website that have

provided settlement class members additional information about the settlement.  Finally, class

members have undoubtedly become aware of the Settlement Agreement through the media coverage that has surrounded the news of the potential settlement and subsequent preliminary approval. This media coverage should be considered a separate form of notice that supplements the formal notice program. *See, e.g., In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 169 (2d Cir. 1987) (noting that widespread publicity and mass media assistance supplemented letter notice). Thus, the form and proposed procedures for notice satisfy the requirements of due process and Rule 23(c)(2).

## IV.  CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court grant their motion for final approval and enter the proposed Order of Final Approval of Settlement, which will provide for: (1) final approval of the Settlement; (2) certification of the Settlement Class; (3) distribute of funds to Settlement Class members in accordance with the Settlement Agreement.

Dated:  September 24, 2007                     Respectfully submitted,

**LAW OFFICES OF THOMAS M. MULLANEY**

By:*/s/ Thomas M. Mullaney (TM4274)*
Thomas M. Mullaney, Esquire
708 Third Avenue, Suite 2500
New York, NY  10017
Telephone:     (212) 223-0800
Facsimile:      (212) 661-9860

*Liaison Counsel for Class*

**BRODSKY & SMITH, LLC**
By: */s Evan J. Smith, Esquire (ES3254)*
Evan J. Smith, Esquire (ES3254)
240 Mineola Blvd.
Mineola, NY 11501
Telephone:     (516) 741-4977
Facsimile:      (516) 741-0626

*Co-Class Counsel*

31

Larry D. Drury, Esquire (admitted *pro hac vice*)
Larry D. Drury, Ltd.
205 W. Randolph Street, Suite 1430
Chicago, IL 60606
Telephone:     (312) 346-7950
Facsimile:     (312) 346-5777

***Co-Class Counsel***

John H. Alexander, Esquire
John H. Alexander & Associates, LLC
100 West Monroe, 21st Floor
Chicago, IL  60602

**Attorney for Plaintiff Marcia Vedral**

Alan S. Ripka, Esquire
Napoli Berm Ripka
115 Broadway
New York, NY  10006

**Attorney for Plaintiff Jimmy Floyd**

Thomas E. Pakenas, Esquire
Dale and Pakenas
641 Lake Street, Suite 400
Chicago, Il 60661

**Attorney for Plaintiff Pilar More**

Thomas A. Zimmerman, Jr., Esquire
Zimmerman and Associates, P.C.
100 West Monroe, Suite 1300
Chicago, IL  60603

**Attorney for Plaintiff Ann Marie Atrack**

Michael David Myers, Esquire
Myers & Company, P.L.L.C.
1809 Seventh Avenue, Suite 700
Seattle, WA  98101

**Attorney for Plaintiffs Shera Paglinawan and
Wendy Shaw**

Scott C. Frost, Esquire
Statman, Harris, Siegel & Eyrich, LLC
333 West Wacker Drive, Suite 1710
Chicago, IL  60606

**Attorney for Plaintiff Jill Giles**

Brian C. Witter, Esquire
DiTommaso Lubin
17 West 220, 22nd Street
Oakbrook Terrace, IL 60181

**Attorneys for Plaintiff Sara Brackenrich**