Marolda et al v. Frey et al                                                                                   Doc. 69 Att. 8



# LITIGATION 2004

SPECIAL REPORT

# PLAINTIFF POWER

A SUPPLEMENT TO
THE AMERICAN LAWYER & CORPORATE COUNSEL

**LITIGATION | HOT SPOTS**



**FRINGE PLAYER** ■ *The Objector*

**JOHN PENTZ**
Class Action Fairness Group
Sudbury, Massachusetts

AFTER THREE YEARS, CLASS action lawyer Lloyd Constantine could taste settlement. Visa U.S.A. Inc. and MasterCard Incorporated had finally agreed to pay his class more than $3 billion. Constantine had avoided an antitrust trial and gotten a great result, and he was about to be rewarded with fees of over $600 million for his efforts. It was the perfect class action ending.

Then the "holdup artist" rode into the courtroom. The notorious class action objector John Pentz of the Class Action Fairness Group left his mark on the case, cutting Constantine's fees to $220 million.

Pentz became the outlaw of class action litigation in 2000, when he opened his own firm after several years as an associate at Boston's Berman DeValerio Pease Tabacco Burt & Pucillo. Pentz says he was disturbed by class actions in which plaintiffs lawyers took home millions and class members won just a coupon. Even worse, he was annoyed by the scornful way judges and his colleagues treated "objectors"—lawyers who challenge settlements and large fee awards.

Pentz founded the Class Action Fairness Group to focus almost exclusively on objecting to class action settlements. He usually shows up at the last minute to try to torpedo a settlement that is sometimes years in the making. Judges tend not to like that tactic. Case opinions are rife with examples of judicial scorn for Pentz's ilk. In a 2000 ruling approving a $2.1 billion settlement with Toshiba America, Inc., for instance, Judge Thad Heartfield of the Eastern District of Texas criticized "canned objections" filed by lawyers seeking "to extract a fee by lodging generic, unhelpful protests."

But Pentz embraces his role. "No court has ever said that it's an illegitimate practice area or improper to devote most of your practice to objecting," he says from his Sudbury, Massachusetts, office.

Only a handful of lawyers regularly object to class action settlements, and even fewer specialize in the field. Pentz quickly became one of the biggest (and most reviled)

---

qualified. Local lawyers with close ties to railroad unions began taking and winning cases in the area.

"I grew up, in essence, a workingman's person, and the judges did too," says Rex Carr, a granddaddy of the local plaintiffs bar who, at 77, still practices with his six-lawyer firm, The Rex Carr Law Firm. "East St. Louis got a reputation, as did Madison County, for having significant verdicts and good trial lawyers," he says.

Thousands of railroad-related cases were filed in Madison County through the early 1980s; verdicts by that time reached up into the millions of dollars. In 1983, for example, *The American Lawyer* described Madison County as "Plaintiffs County, USA," citing a "spectacular" $58 million plaintiffs verdict in a dioxin case against Norfolk & Western Railway Co. That case, like so many of the railroad suits tried in Madison County, had only a tenuous connection to the place.

Over time Madison County transitioned from a haven for railroad cases to a jackpot venue for asbestos litigation and class action suits. Asbestos suits began to pour into the county in the mid-1980s. The first cases involved local residents who'd been exposed to asbestos while working in nearby factories, like the Owens Corning glass factory or the Shell Oil Company's Wood River refinery. Local lawyers filed the early suits, but were soon followed by national asbestos players like Dallas's Baron & Budd, which opened an office in Glen Carbon, Illinois. Randall Bono, a local asbestos star, frequently collaborated with national asbestos lawyers such as Michael Brickman and Ronald Motley of Ness Motley. Between 1986 and 1989, according to the *St. Louis Post-Dispatch*, about 2,500 asbestos cases were filed in Madison County. Filings dropped off for a while, but picked up again in the late 1990s.

Meanwhile, another s began to appear on the judges in the Edwards house. In 1995, Rex Carr's Carr Korein Tillery, filed a against Ameritech Corp., a the telephone company h ed customers by chargi maintenance fee for which had scarcely provided not class actions were filed in midwestern states, but the discovery work was done County. "[Madison Count lawyers] were very aggressi of discovery," says Richard partner at Chicago's Kirkl who represented Amerit drives the bus in terms of c

## MADISON COUNTY EVOLVED FR
## A HAVEN FOR RAILROAD CASES
## TO A JACKPOT VENUE FOR ASBI
## LITIGATION AND CLASS ACTION

tion." Ameritech was forced to settle the cases i County, and settlement did cheap: Ameritech paid out lion in two separate settleme four state cases. Stephen 1 plaintiffs lawyer who handle the legwork, says that after A he switched his practice fror injury cases to class action they "got his brain workir And his firm's bank account. was awarded about $16 mill work in Ameritech.

OTHER LAWYERS—LOC national—took note. As cla plaintiffs lawyers were beater jurisdictions such as Alabama gan to migrate toward Madis ty, explains John Beisner, he class action practice grou Washington, D.C., office of O & Myers. National plaintiffs fi referred class actions to County plaintiffs lawyers; tv The Lakin Law Firm and Tillery (as the firm is now knov come to dominate the marl Korein Tillery in particular g

reputation as the toughest player.

By 2000, 39 nationwide class actions had been filed in Madison County, according to a study that Beisner coauthored for the Manhattan Institute for Policy Research. Only three years later, the number had nearly tripled. Why the onslaught? Says Beisner: "The ease with which classes were certified and the way that discovery motions went."

The judges waving class certification and discovery motions through the system were also accepting—maybe not so coincidentally—large donations from the very plaintiffs lawyers they were ruling for. Illinois law does not have ceilings on campaign contributions to local judges, nor conflict-of-interest laws regarding donations. And so lawyers have fed big money to judges. A study by the *St. Louis Post-Dispatch* noted that in 2002, Madison County judges raked in three times as much in campaign contributions as judges in nearby counties. (Judges cannot retain the unspent money for themselves; they must give it back to contributors, to other political campaign committees, or to charity.) Appellate judge Melissa Chapman, a Democrat and onetime personal injury lawyer, collected $218,000—the second-highest amount for an appellate judge in Illinois. Nicholas Byron, also a Democrat and the circuit court judge who at the time ran the asbestos docket, collected $70,000 for a simple retention vote—meaning he faced no opposition.

In Madison County, there's a geographical line of demarcation between plaintiffs and defense firms. The two largest defense firms in southern Illinois, 99-lawyer Heyl, Royster, Voelker & Allen, and 86-lawyer Burroughs, Hepler, Broom, MacDonald, Hebrank & True, both have their Edwardsville headquarters in the Mark Twain building, a brand-new office building that's nearly adjacent to the courthouse. But almost without exception, plaintiffs firms occupy scrappier offices on rural roads, off highways and near oil refineries. The Lakin Law Firm's dumpy two-story building in Wood River, Illinois, sits next to a working BP-Amoco oil refinery. Inside, the lobby looks like a podiatrist's waiting room. If plaintiffs lawyers are raking in millions of dollars in Madison County—and by most accounts, they are—the money has not translated into opulent offices.

That discretion may be tactical. Plaintiffs lawyers here like to play up their folksy roots. "We're a local law firm, not making a lot of noise," says Jeffrey Cooper, managing partner of East Alton, Illinois–based Simmons-Cooper. In only five years Simmons-Cooper has quietly become one of the county's most successful plaintiffs-side asbestos firms. Accepting referrals from around the country, Simmons-Cooper filed 622 asbestos cases in Madison County in 2003, and 351 in 2002. Its clients are predominantly victims of mesothelioma, the fatal cancer contracted from asbestos exposure—and the sweet spot of asbestos litigation because cases command the most hefty settlements.

SimmonsCooper was founded in 1999 by John Simmons, a Madison County native who had previously worked at another asbestos firm in town. Simmons, then 31 years old, had the brashness to invite storied liti-



JEFF COOPER OF SIMMONSCOOPER SPECIALIZES IN CUTTING DEALS WITH DEFENSE LAWYERS.

gator-turned-judge Randy Bono to step down from his seat on the Circuit Court of Madison County and join his two-lawyer firm—and the luck to have Bono say yes. Less than a year later, Simmons brought in Jeff Cooper, a young personal injury lawyer who'd grown up in Granite City, Illinois, an industrial town north of Edwardsville. Cooper had previously

names in the business, plaintiffs lawyers say, second only to Lawrence Schonbrun, a solo practitioner in Berkeley. Over the past four years, Pentz has objected to some huge class action settlements, including Bridgestone/Firestone Retail & Commercial Operations LLC, Lucent Technologies Inc., AT&T Corp., and The Goodyear Tire & Rubber Company.

Pentz insists that he's doing good work for class members. But class counsel Constantine claims that objectors had little to do with his reduced paycheck in the Visa/MasterCard case; New York Eastern District Judge John Gleeson independently found his fee petition excessive. "The court swatted down every single one of [Pentz's] objections," Constantine says.

So how does Pentz make a living? He refuses to generalize, arguing that every case is unique. But he will acknowledge that the bulk of his income does not come from court-awarded fees. When a judge amends a settlement after Pentz objects, Pentz receives a fee award, usually 1 or 2 percent of the total fees in the case; or, if his objection results in benefits to the class, around 20 percent of the value added. But that kind of fee is the exception rather than the rule, Pentz says.

Instead, objectors make most of their money when class counsel pay them to drop their objections. Pentz concedes that payments from class counsel usually dwarf court awards. Joe Whatley of Birmingham-based Whatley Drake, who faced off with Pentz in three different cases, says he has always paid Pentz to drop objections without making changes to the settlement. "It's like having to pay a tax," Whatley says.

Today, Pentz's practice is about to make a sharp U-turn. He is preparing to become class counsel himself, representing customers suing The DIRECTV Group, Inc., in Beaumont, Texas. His newest job isn't selling out the cause, he argues, but a natural outgrowth of his work. After all, the case began with an objection he filed in an Indiana settlement. Besides, the onetime crusader notes, at the end of the day, "it becomes like any other job." Today the party-crasher seems just to want an invite to the big bash.

—LISA LERER